RUSSELL L. DAUGHERTY, PROSECUTING ATTORNEY
OF CABELL COUNTY, WEST VIRGINIA

v.

JIM ELLIS, COMMISSIONER OF THE COUNTY COURT
OF CABELL COUNTY, *A Corporation*

(No. 10835)

Submitted September 19, 1956. Decided December 18, 1956.

*J. J. N. Quinlan, W. E. Parsons, C. William Gates,* for plaintiff in error.

*John G. Fox,* Attorney General, *Charles R. McElwee,* Assistant Attorney General, *Russell L. Daugherty, Raymond I. Lucas,* for defendant in error.

Haymond, Judge:

In this proceeding instituted in the Circuit Court of Cabell County and based on Section 7, Article 6, Chapter 6, Code, 1931, the petitioner, Russell L. Daugherty, Prose-

cuting Attorney of Cabell County, West Virginia, seeks the removal of the defendant, Jim Ellis, from the office of Commissioner of the County Court of that county on the grounds of incompetence, official misconduct, and malfeasance in office. To a final judgment removing the defendant from that office he prosecutes this writ of error in this Court.

Upon a verified petition filed and entered of record in the circuit court on January 27, 1956, a summons was issued requiring the defendant to appear before the circuit court on February 10, 1956, and answer the charges set forth in the petition; and on the return day of the summons the defendant filed his verified answer by which he denied each of the charges preferred against him.

The petition sets forth grounds for the removal of the defendant from office in four separate specifications.

The first specification charges, in substance, on information that the defendant on December 28, 1955, in Cabell County, unlawfully and feloniously entered into a conspiracy with other persons to take and carry away certain personal property not owned by them but owned by the County Court of Cabell County of the value of $4,600.00, consisting of thirteen cows of the value of $2,925.00, seventeen calves and heifers of the value of $1,275.00, five sows of the value of $200.00, and twenty pigs of the value of $200.00; and that the defendant and such other persons pursuant to such conspiracy did unlawfully take and carry away the foregoing public property of the county court.

The second specification charges in substance that on the 28th day of December, 1955, the defendant without authority and without the concurrence of either of the other two commissioners of the county court appointed O. C. Shively to sell a certain herd of livestock owned by the county court, consisting of thirteen cows, seventeen calves and heifers, five sows and twenty pigs, of the total value of $4,600.00; that Shively acting under

the direction and pretended authority of the defendant sold to G. S. Banks five sows for $65.00 and five cows for $690.00, a total of $755.00; to Henry E. Sullivan six calves for $90.00 and four cows for $552.00, a total of $642.00; to John G. Werner nineteen pigs for $76.00 and one cow for $138.00, a total of $214.00; and to Herbert M. Graham eleven calves and heifers for $275.00 and three cows for $414.00, a total of $689.00, aggregating $2,300.00; that the defendant took and received from Shively and delivered to George F. Cabell, the supervisor of the county poor farm at Ona, in Grant District, Cabell County, where the foregoing livestock was maintained by the county court, the sum of $2,300.00 in currency; that the action of the defendant in effecting the foregoing sales was not concurred in by either of the other two commissioners of the county court and was not at any time ratified by either of them; and that the sales so concluded by the defendant were not authorized or voted upon by a quorum of the county court and were in all respects invalid and without authorization in law.

The third specification charges, in substance, on information that the defendant unlawfully and deliberately conspired with Shively and other persons to defraud the County Court of Cabell County and to steal from it certain money representing the difference between the purported original sale price and the amount received by the defendant and Shively and the other persons from a resale of the livestock; that the foregoing conspiracy was devised by the respondent and Shively and the other persons prior to a sale by which thirteen cows were sold to Don Hunter at the price of $225.00 each, aggregating $2,925.00, a difference of $625.00 between the resale price of the cows and the original price for all the livestock sold to the four individual purchasers; that the cows sold to the original buyers were never delivered to them but were delivered on December 28 and December 29, 1955, at the direction of the defendant, acting by Shively, to Hunter; that Banks, Sullivan and Graham were mere figureheads in the conspiracy; and that all the

livestock that was delivered to them was delivered under the guise of a sale and would have been redelivered to Shively or to the defendant or to such persons as either of them might designate, for the purpose of a resale at its true and actual value.

The fourth specification charges the defendant with incompetence in the conduct of his office and in the management of publicly owned property by reason of his action, as one member of the county court, in selling the property, in unlawfully appointing an unqualified agent to act in behalf of the county court who was also acting as agent for one or more of the original purchasers, and in accepting and delivering the sum of $2,300.00, represented by twenty three one hundred dollar bills, in payment for all the livestock sold to the original purchasers.

The prayer of the petition is that the defendant be required to appear and answer the charges; that upon proof the defendant be removed from his office and dealt with according to law; and that the petitioner be granted general relief.

The proceeding was heard by the circuit court without a jury on April 18 and 19, 1956, at which time evidence, consisting of the testimony of numerous witnesses and certain exhibits, was introduced in behalf of the petitioner. The defendant did not testify in his own behalf or offer any evidence, other than three written exhibits, to controvert the charges set forth in the petition. Before the introduction of the evidence in behalf of the petitioner the defendant moved the court to strike the first specification from the petition on the ground that the defendant at the October Term, 1955, of the Common Pleas Court of Cabell County had been indicted, tried and acquitted of the alleged offense of unlawfully and feloniously combining and conspiring with other persons to take and carry away certain personal property which was not owned by them. He also filed a plea of res judicata which alleged that the defendant had been previously indicted, tried and acquitted of the identical

charge set forth in the first specification, and that the defendant in the criminal proceeding was the same person as the defendant in this proceeding. The court denied the motion of the defendant and held the plea to be insufficient in law.

At the conclusion of the evidence introduced in behalf of the petitioner the defendant moved the court to strike the evidence relating to each of the four specifications on the ground that it is insufficient to support a finding against the defendant. The court overruled the foregoing motion of the defendant and by final judgment entered May 10, 1956, ordered the removal of the defendant from the office of Commissioner of the County Court of Cabell County. To that judgment this Court awarded this writ of error and supersedeas on June 11, 1956, upon the application of the defendant.

The defendant was elected a Commissioner of the County Court of Cabell County at the general election held in that county on November 2, 1954, for a term of six years from January 1, 1955, and at the time of the transactions involved in this proceeding he held and occupied that office and was also the president of the county court.

Two or three days prior to Wednesday, December 28, 1955, the defendant talked to O. C. Shively about a sale of all the livestock at the county poor farm which had been previously leased by the county court to Case Farm Machinery Company, in which Shively owned stock and of which he was a vice president. That company wanted possession of the farm and the barn and Shively was interested in the removal of the livestock from the premises to enable the company to use the barn. In the discussion between the defendant and Shively of a sale of the livestock Shively informed the defendant that he thought he could obtain bids amounting to approximately $1,800.00 for the cattle and the defendant stated that he did not consider that amount sufficient. Shively in connection with his employment with the Case Farm Ma-

chinery Company was acquainted with a number of farmers in the general area in which the company operated and he and the defendant reached an understanding by which Shively would sell the livestock for the defendant. Shively testified that it was understood between him and the defendant that the sale was subject to ratification by the county court, but he also admitted that the sales which he subsequently made to the persons who purchased various lots of the livestock from him were not made subject to that condition.

About a week before the defendant and Shively entered into the foregoing arrangement by which Shively was to sell the livestock at the county poor farm, Shively was informed by Henry E. Sullivan and Don Hunter, each of whom owned or operated a farm, that Hunter desired to purchase cattle and would pay as much as $200.00 for each available head of good cattle. At that time the livestock owned by the county court was not mentioned and the evidence does not show that Shively informed the defendant of the price which Hunter was willing to pay for each head of cattle.

On Wednesday, December 28, 1955, Shively talked in person or by telephone to G. S. Banks, the treasurer of Case Farm Machinery Company, Herbert M. Graham, an employee of Case Driveway Company, the place of business of which was located near that of Case Farm Machinery Company, Henry E. Sullivan, a farmer and a cousin of Don Hunter, and John G. Werner, a farmer who resided near Barboursville, all of whom were friends of Shively, and separate lots of the livestock were sold by Shively to each of them at a price fixed by Shively which was paid to him in cash by each purchaser. Though the defendant was not acquainted with the values of livestock he made no effort to ascertain the value of the livestock at the county poor farm but instead allowed Shively to fix the price for which it would be sold.

The sale to Banks included five sows for $65.00 and five cows for $690.00, or a total purchase price of $755.00; the sale to Graham included eleven calves and

heifers for $275.00 and three cows for $414.00, or a total purchase price of $689.00; the sale to Sullivan included six calves for $90.00 and four cows for $552.00, or a total purchase price of $642.00; and the sale to Werner included nineteen pigs for $76.00 and one cow for $138.00, or a total purchase price of $214.00; and the amount received from the sale of the entire herd was $2,300.00. Each of these purchasers paid the purchase price to Shively in currency instead of by check and Shively gave each of them a receipt for the amount paid. Banks did not see or inspect the livestock purchased by him before he paid the purchase price and Graham did not see the cows before he agreed to buy them.

The transaction was completed on December 28 and 29, 1955, by the payment of the purchase price by each of the purchasers and the delivery of the livestock to each of them, except the cows purchased by Banks, Graham and Werner which were never delivered to them but were delivered instead to Sullivan or Don Hunter, and all the livestock was removed from the county poor farm on December 28 and 29, 1955, at the direction of Shively and with the consent of George F. Cabell, the supervisor of the county poor farm, who had been instructed by the defendant to cooperate with Shively in connection with the removal of the livestock and who assisted some of the purchasers in its removal from the farm. The cows which were sold to Banks, Graham and Werner were immediately sold by them to Sullivan and Sullivan and Hunter removed all of them from the county poor farm on December 28 and 29, 1955, from which place they were transported by a truck driven by Walter Edmonds, an employee of Werner, to a farm owned by Don Hunter in Wayne County. Immediately after the thirteen cows had been purchased by Sullivan he sold them to Hunter for $225.00 each, or a total purchase price of $2,925.00, and a deposit of $100.00 on the total purchase price was made to Sullivan by Hunter's father.

After the sale conducted by Shively had been concluded, the aggregate amount of $2,300.00 representing

the total proceeds realized from the entire herd and consisting of twenty three one hundred dollar bills, was delivered by him to the defendant and on December 30, 1955, Shively and the defendant went to the county poor farm and informed Cabell of the sale. At that time the defendant gave the $2,300.00 to Cabell and requested him to give receipts to Shively for the purchasers of the different lots of livestock. After receiving the money Cabell paid it to the sheriff of the county and took a receipt from him for the money.

On Friday morning, December 30, 1955, The Huntington Herald Dispatch, a daily newspaper, published an account of the sale of the livestock at the county poor farm for $2,300.00. The newspaper article indicated that the livestock had been sold for less than it was worth, contained adverse criticism of the sale, and stated that Commissioners Ellis and DeVilbiss could not be reached for comment, and that Commissioner Heiner had said that he had no knowledge of the sale.

Heiner and DeVilbiss testified that although it was generally understood among the members of the county court that as the county poor farm had been leased and was to be vacated by the county court, the livestock at the farm was to be sold but that no formal action had been taken with respect to a sale and that the first knowledge had by each of them that the livestock had been sold was that which they obtained from the newspaper story of the sale.

Mrs. DeVilbiss, who had been a commissioner of the county court since September, 1955, testified that before the sale of the livestock had been made she received no detailed information from Ellis concerning it; that on Thursday, December 29, 1955, in connection with a meeting of the county court which was devoted to another matter the defendant told her, with reference to the cattle, that "they are sold"; that the defendant also said he thought Cabell was going to sell or had sold the cattle; that the defendant stated that there had been bids

of $1,000.00 and $1,800.00, but that neither bid was sufficient; and that at the request of the defendant the witness called Cabell by telephone and told him not to sell the cattle until all the members of the county court conferred with him. She also testified that the sale was never authorized or ratified by the commissioners or by the county court by any order or formal action.

Commissioner DeVilbiss further testified that on Saturday, December 31, 1955, following the sale, the defendant called upon her at her home and asked her if she would agree to the sale of the cattle; that he told her it had been made subject to ratification by the county court and was not final; that she and the defendant decided that the livestock should be returned because the prosecuting attorney had advised them to return it or charges would be preferred; and that a telephone call to the effect that the livestock should be returned was then made from her home.

Within a few days after the sale all the livestock was returned to the county poor farm from the different places to which some of the livestock had been taken and, by orders issued on January 3, 1956, signed by each of the three commissioners, each of the four original purchasers was refunded the amount which he had paid for the livestock purchased by him. Hunter did not pay Sullivan the purchase price of $2,925.00 which he had agreed to pay for the thirteen cows and Sullivan returned the $100.00 which had been deposited with him in connection with that sale.

After the sale of the livestock the lease of the county poor farm to the Case Farm Machinery Company, which does not appear to have been authorized by any valid action of the county court, was cancelled by mutual consent of the parties to it.

The statute upon which this proceeding is based, Section 7, Article 6, Chapter 6, Code, 1931, in part, provides:

"Any person holding any county, magisterial district,

independent school district, or municipal office, including the office of a member of a board of education, the term or tenure of which office is fixed by law, whether elected or appointed thereto, except a judge of a court of record, may be removed by the circuit court of the county wherein such officer or person resides, or the judge of such court in vacation, on any of the grounds, or for any of the causes, for which a state officer may be removed under section five of this article or for any of the causes or on any of the grounds provided by any other statute. The charges may be preferred, in the case of any county officer, by the county court, or other tribunal in lieu thereof, any other officer of the county, or any five or more voters thereof; * * * .

"The charges shall be reduced to writing and entered of record by the court, or the judge thereof in vacation, and a summons shall thereupon be issued by the clerk of such court containing a copy of the charges and requiring the officer or person named therein to appear before the court or judge, at the courthouse of the county where such officer resides, and answer the charges on a day to be named therein, which summons shall be served in any manner by which a summons commencing a civil suit may be served, and at least five days before the return day thereof. The court, or the judge thereof in vacation, shall, without a jury, hear the charges and all evidence offered in support thereof, or in opposition thereto, and upon satisfactory proof of the charges shall remove any such officer or person from office, * * * ."

Section 5 of the same Article and Chapter, referred to in Section 7, contains these provisions: "Any state officer holding any elective office (except the governor, any judge, or a member of the legislature of this State) may be removed from office, by the governor, in the manner provided in the following section: (a) when disqualified from holding the office under any provision of the Constitution of this State, or any law now in force, or which may hereafter be enacted, whether such disqualification arose before or after his induction into

office; (b) for official misconduct, malfeasance in office, incompetence, neglect of duty, or gross immorality."

The defendant assigns as error the action of the circuit court (1) in overruling the motion of the defendant to strike the first specification from the petition and in rejecting his plea of res judicata to the charge set forth in that specification; and (2) in refusing to strike the evidence introduced by the petitioner relating to each of the four specifications in the petition which, the defendant insists, is not sufficient to establish the charge alleged in any of the specifications.

The first assignment of error is not well founded and the action of the court in overruling the motion to strike the first specification from the petition and in rejecting the plea of res judicata was proper.

The first specification states a separate and distinct cause of action from the criminal offense charged in the indictment and mentioned in the plea of res judicata, although each cause of action arises from and relates to the same transaction. Each cause of action is created by and is based upon a separate and wholly unrelated statute. The offense for which the defendant was indicted and tried, and of which he was acquitted, was based upon Section 7, Article 6, Chapter 61, Code, 1931, a criminal statute, which applies to any person who commits such offense regardless of his status as a public officer or a private person. The charge in the first specification is based upon Section 7, Article 6, Chapter 6, Code, 1931, which relates to and governs the conduct of certain specified public officers. Though the defendant in each proceeding is the same person, the proceedings are separate and distinct, a different person is the complainant in each proceeding, and the institution of each proceeding is for an entirely different purpose. In the criminal proceeding the complainant was the State; in the instant proceeding the complainant is the Prosecuting Attorney of Cabell County. The issue in each proceeding is different. In the proceeding mentioned in the plea the issue

was the guilt or the innocence of the defendant of a criminal offense and the punishment to be imposed in the event of guilt is fine and imprisonment; in the instant proceeding the issue is whether the conduct of the defendant as a county officer warrants his removal from office and, if so, no fine or imprisonment may be imposed in such proceeding.

The instant proceeding is a civil action and is not a criminal prosecution. *Dawson* v. *Phillips,* 78 W. Va. 14, 88 S. E. 456. The statute upon which it is based provides that the court or the judge thereof in vacation shall, without a jury, hear the charges and upon satisfactory proof of the charges shall remove the person proceeded against from the office held by him. In these particulars a removal proceeding is fundamentally different from a criminal proceeding in which the accused is entitled to a trial by jury and in which the proof must establish his guilt beyond all reasonable doubt.

To constitute res judicata and to apply that doctrine in a proceeding at law or in equity there must be concurrence of these four conditions: (1) Identity in the thing sued for; (2) identity of the cause of action; (3) identity of the persons and the parties to the proceeding; and (4) identity of the quality in the persons for or against whom the claim is made. *Collins* v. *Treat,* 108 W. Va. 443, 152 S. E. 205; *Marguerite Coal Company* v. *The Meadow River Lumber Company,* 98 W. Va. 698, 127 S. E. 644. See also *Carter* v. *City of Bluefield,* 132 W. Va. 881, 54 S. E. 2d 747. As none of these essential conditions is present in the instant proceeding, the doctrine of res judicata can not be applied to the charge set forth in the first specification. Though the plea of res judicata was properly rejected the proof does not sufficiently establish the allegations of that specification in the petition.

The evidence, however, clearly shows that the sale of the livestock conducted by Shively, who does not appear to have had any prior experience in making sales of livestock but who was allowed by the defendant to fix

the price for each article, and who acted with the acquiescence and the cooperation of the defendant and in his behalf, was never authorized or ratified by any valid action of the county court.

A county court, a corporation created by statute, can do only such things as the law authorizes it to do, and it must act in the manner prescribed by law. *Barbor* v. *County Court of Mercer County,* 85 W. Va. 359, 101 S. E. 721; *Goshorn's Ex'rs* v. *County Court of K a n a w h a County,* 42 W. Va. 735, 26 S. E. 452; 20 C.J.S., Counties, Sections 87 and 88; 14 Am. Jur., Counties, Section 32; 5 Michie's Jurisprudence, Counties, Sections 24 and 27. A county court can exercise its powers only as a court, while in legal session with a quorum present, and it must follow that procedure and enter its proceedings of record to make its action valid and binding. *State ex rel. County Court of Tyler County* v. *Morris, Judge,* 91 W. Va. 269, 112 S. E. 519; *Goshorn's Ex'rs* v. *County Court of Kanawha County,* 42 W. Va. 735, 26 S. E. 452. See *Wysong* v. *Walden,* 120 W. Va. 122, 196 S. E. 573. The members of a county court can not separately and individually give their consent or enter into a contract and in that manner obligate the court as a corporate entity. *State ex rel. County Court of Tyler County* v. *Morris, Judge,* 91 W. Va. 269, 112 S. E. 519; *Goshorn's Ex'rs* v. *County Court of Kanawha County,* 42 W. Va. 735, 26 S. E. 452. See *Pennsylvania Lightning Rod Company* v. *Board of Education of Cass Township,* 20 W. Va. 360; *Wysong* v. *Walden,* 120 W. Va. 122, 196 S. E. 573.

Though Shively testified that the understanding between him and the defendant was that the livestock was sold subject to ratification by the county court and though Commissioner DeVilbiss testified that the defendant told her that the sale was made subject to such ratification and was not final, the clearly established facts and circumstances surrounding the entire transaction, in the absence of any testimony by the defendant concerning his intention and his arrangement with Shively, completely refute any claim, that any sale con-

ducted by Shively to the four original purchasers was made upon that condition. None of the purchasers testified that his purchase of the livestock from Shively was not a final or fully completed sale. In fact each of them considered and treated the transaction between him and Shively as a final sale.

If the intention of the defendant in permitting and participating in the sale conducted by Shively was that it should be subject to ratification by the county court, the purchasers would not have paid the full purchase price in cash or accepted immediate delivery of the property purchased which one of them had never previously inspected or seen and some of which they immediately resold before the herd was removed from the county poor farm. Moreover, the defendant would not have unconditionally accepted the purchase price of $2,300.00, represented by twenty three one hundred dollar bills, until he had consulted the other members of the county court, would not have delivered it to the supervisor of the farm and instructed him to pay it to the sheriff and to issue receipts to the purchasers, which the supervisor did, and would not have allowed the immediate removal of the entire herd from the farm under the directions of Shively which the defendant approved and instructed the supervisor to follow. All the foregoing acts of the participants in the transaction are fully established by undisputed evidence.

If the sale was made subject to ratification, it is unlikely that the defendant would have withheld information of the details of the transaction from the other two commissioners, or that, being aware that they had no knowledge of the transaction, he would have acted as he did in connection with the sale and disposition of the livestock. It is also significant that the defendant did not at any time, either before or after the transaction was revealed or became known to the other commissioners, request its ratification by the county court, and that his only gesture of that nature was to ask Commissioner DeVilbiss on Saturday, two days after the

sale was concluded and one day after it had been exposed in the newspaper article, if she would agree to the sale during his conference with her in which  they decided to comply with the demand of the prosecuting attorney that the livestock be returned to the county poor farm.

The secrecy with which the defendant acted in connection with the transaction, the lack of any effort by him to have it ratified by the county court, and his willingness to cause the prompt return of the livestock at the direction of the prosecuting attorney indicate clearly that the defendant, who had previously served as a member of the county court for a period of eleven months, knew before and when it occurred that the sale was not only wholly unauthorized and improper but that it constituted a wrongful and illegal act upon his part.

Though the entire transaction was invalid and subject to cancellation, because not authorized by the county court, all the other requirements of a valid private sale were fully satisfied. The offer of Shively to sell the different lots of livestock was accepted by each purchaser, the agreed purchase price was fully paid and accepted, the livestock bought by each purchaser was promptly delivered to him or the person designated to receive it, and the possession of the livestock was transferred from the county court and delivered to other persons by the removal of the livestock from the farm. The evidence shows that to the extent that the defendant was able to do so, he accomplished his purpose to conclude a final and completely executed sale of the herd of livestock. The subsequent cancellation of the entire transaction did not exonerate the defendant or alter the character of his conduct or extinguish the consequences of his unauthorized, wrongful and unlawful action.

The evidence shows clearly that, if there had been no adverse publicity which immediatly followed the discovery of the sale and if the prosecuting attorney had not required its immediate cancellation and the return

of the livestock, the transaction, at least as far as the defendant was concerned, would have remained in force and effect and would not have been disturbed, and that the final result would have been a substantial loss to the county. The thirteen cows, each of which was sold for $138.00 to the original purchasers, were immediately resold to Hunter for $225.00 apiece, or a total of $2,925.00. The price at which each was voluntarily sold established its true and actual value at that time. If the thirteen cows were worth $2,925.00, which was $625.00 more than the price at which the entire herd was originally sold, the cows were worth $2,925.00 to the county court at the time of the sale.

The title to the livestock was vested in the county court which held it for the benefit of the county or its citizens and inhabitants, in trust for public purposes. Section 1, Article 3, Chapter 7, Code, 1931; *Shaffer* v. *Monongalia General Hospital*, 135 W. Va. 163, 62 S. E. 2d 795; *Foley* v. *County Court of Doddridge County*, 54 W. Va. 16, 46 S. E. 246; *Hall's Safe and Lock Company* v. *Scites*, 38 W. Va. 691, 18 S. E. 895. It was the plain duty of the defendant, as a commissioner of the county court and as such the representative of the people of the county, to exercise due diligence and reasonable care to protect and preserve the property held by the county court against loss and injury and to safeguard the rights of the county and its citizens and inhabitants in such property. The defendant failed to perform this duty, but instead violated it by attempting to make final disposition of the livestock without authority at a price which was substantially less than the value of only a part of it.

The act of the defendant in concluding the sale of the livestock was unauthorized, wrongful and illegal and was committed by him with intent to accomplish some purpose which he has not disclosed or explained but which, in the light of the fully established surrounding circumstances, can not be accepted or condoned as excusable or proper. In so acting the defendant was guilty

of malfeasance in office which by Sections 5 and 7, Article 6, Chapter 6, Code, 1931, is conduct for which a commissioner of a county court will be removed from that office. Though the statute does not define malfeasance in office this Court has said, in *State ex rel. Sonner* v. *Dean,* 98 W. Va. 88, 126 S. E. 411, quoting from Bouvier's Law Dictionary, that "malfeasance is doing an act which is positively unlawful or wrongful." In that case this Court held that an attempted unauthorized arrest of a person by a deputy sheriff was not an act of misfeasance but was an act of malfeasance.

Malfeasance has been defined by appellate courts in other jurisdictions as a wrongful act which the actor has no legal right to do, *McGuire* v. *Corn,* 92 Ohio App. 445, 110 N. E. 2d 809; as any wrongful conduct which affects, interrupts or interferes with the performance of official duty, *State* v. *Ward,* 163 Tenn. 265, 43 S. W. 2d 217; as an act for which there is no authority or warrant of law, *Warren* v. *Commonwealth,* 136 Va. 573, 118 S. E. 125; as an act which a person ought not to do at all, *Bell* v. *Josselyn,* 69 Mass. (Gray) 309, 63 Am. Dec. 741; *Lee* v. *Providence Washington Insurance Company,* 82 Mont. 264, 266 P. 640; *Rising* v. *Ferris,* 216 Ill. App. 252; as a wrongful act which a person ought not to do, *Robbins* v. *Commonwealth,* 232 Ky. 115, 22 S. W. 2d 440; as an act which is wholly wrongful and unlawful, *Coite* v. *Lynes,* 33 Conn. 109; *State ex rel. Hardie* v. *Coleman,* 115 Fla. 119, 155 So. 129, 92 A.L.R. 988; *Minkler* v. *State of Nebraska ex rel. Smithers,* 14 Neb. 181, 15 N. W. 330; as that which an officer has no authority to do and is positively wrong or unlawful, *White* v. *Lowry,* 162 Miss. 751, 139 So. 874; and as the unjust performance of some act which the party performing it has no right, or has contracted not, to do, *National Surety Company* v. *State ex rel. Rathburn,* 90 Ind. App. 524, 161 N. E. 832; *Dudley* v. *City of Flemingsburg,* 115 Ky. 5, 72 S. W. 327, 60 L.R.A. 757, 103 Am. St. Rep. 253, 1 Ann. Cas. 958; *State ex rel. Jones* v. *Doucet,* 203 La. 743, 14 So. 2d 622. To establish malfeasance in office it is not necessary to

show a specific intent to defraud, or that the act is criminal or corrupt in character. *Warren* v. *Commonwealth*, 136 Va. 573, 118 S. E. 125; *Law* v. *Smith*, 34 Utah 394, 98 P. 300; *State ex rel. Attorney General* v. *Lazarus*, 39 La. Ann. 142, 1 So. 361. See also *County Court of Tyler County* v. *Duty*, 77 W. Va. 17, 87 S. E. 256.

The conduct of the defendant in connection with the sale of the livestock is within the foregoing definitions of malfeasance and requires his removal from the office of Commissioner of the County Court of Cabell County. In *State to the Use of Cardin* v. *McClellan*, 113 Tenn. 616, 85 S. W. 267, 3 Ann. Cas. 992, the Court said that malfeasance is the doing of an act which an officer had no legal right to do at all and that when an officer, through ignorance, inattention, or malice, does that which he has no legal right to do at all, or acts without any authority whatsoever, or exceeds, ignores, or abuses his powers, he is guilty of malfeasance. A commissioner of a county court who, acting as an individual member, makes an unauthorized sale of a herd of livestock owned by the county for a sum which is substantially less than the value of a part of the herd, is guilty of malfeasance in office which warrants his removal from office under Sections 5 and 7, Article 6, Chapter 6, Code, 1931.

The uncontradicted evidence fully supports the finding upon which the judgment of the circuit court is based and for that reason such finding will not be disturbed by this Court. The finding of a trial court upon facts submitted to it in lieu of a jury will be given the same weight as the verdict of a jury and will not be disturbed by an appellate court unless the evidence plainly and decidedly preponderates against such finding. *Hysell* v. *Sterling Coal and Manufacturing Company*, 46 W. Va. 158, 33 S. E. 95; *Moore* v. *Strickling*, 46 W. Va. 515, 33 S. E. 274, 50 L.R.A. 279.

The petitioner contends that the action of the defendant in connection with the private sale of the livestock constituted a violation of Section 3, Article 3, Chapter 7,

Code, 1931, as amended by Chapter 49, Acts of the Legislature, 1947, Regular Session, which provides in substance that in all instances in which the county court of a county is authorized to sell or dispose of any property, real or personal, such property shall be sold at public auction at the front door of the courthouse of the county by the president of the county court after publication of notice of the time, place and terms of sale for the period and in the manner specified, except that such requirement shall not apply to the sale of any one item of property of less value than one thousand dollars. In view of the conclusion reached that the defendant was guilty of malfeasance in office and is subject to removal from office on that ground, it is unnecessary to consider or determine whether the provision of the statute that the sale of any one item of property of less value than one thousand dollars is not required to be made at public auction applies to the entire herd which was sold in separate lots for the aggregate of $2,300.00 or to the individual articles of livestock in the herd each of which was sold for less than the sum of one thousand dollars.

The judgment of the Circuit Court of Cabell County is affirmed.

*Affirmed.*

GIVEN, JUDGE, dissenting:

The trial court based its judgment of guilt principally, at least, on the alleged violation of Code, 7-3-3, as amended, relating to sale of county or district property by public auction, where "the sale of any one item" is of greater value than one thousand dollars. This Court places its holding not on such a violation but on the single ground that defendant was guilty of "malfeasance" in office. The only basis in the testimony on which such a holding could be founded relates to the sales of livestock described in the majority opinion. Admittedly, no valid sales were consummated, for the reason that the proposed sales were not ratified by the county court. Therefore, the only possible questionable conduct or wrongdoing on the part of defendant relates to his ne-

gotiation of the proposed sales. It seems to me, and appears to be made clear by the majority opinion, that if the proposed sales were by the defendant intended to be on the condition, express or implied, that they should be valid only upon confirmation by the court, the defendant did nothing unauthorized or wrong.

There is no question that the county farm whereon the livestock had been previously kept by the county court had been leased to the Case Farm Machinery Company, and that that company was expecting and insisting on immediate possession of the farm and was entitled thereto. Frank Heiner, one of the three members of the county court, was asked: "Did you vote to abandon the farm?" He answered: "No. We never took a vote on it. We discussed it and decided or agreed that we should abandon the farm." It was testified to in effect, and not denied, that the members of the county court, as well as Mr. Cabell, for twenty seven years superintendent of the farm and who participated in the closing of the sales as between Shively and the purchasers, all understood and agreed that the livestock would necessarily have to be sold for the purpose of delivering possession of the farm to the lessee. Illustrative of such testimony is that of Vinson DeVilbiss, a member of the county court: "Q. Prior to that time [date of sale] had there been any meetings of the Cabell County Court concerning those cattle? A. Well, I don't think there had been any formal meeting of the court concerning the sale of the cattle. Q. Had there been any discussions by and between the members of the court? A. Yes. Q. Was the respondent, Mr. Jim Ellis, present at any such discussion or meeting? A. Well, I think so, yes." Neither the leasing of the farm nor the right of the lessee to such possession is questioned. In these circumstances, the defendant, as president of the county court, undertook to negotiate the sale of the livestock. I say, "negotiate" the sale advisedly for the reason that I believe the evidence establishes conclusively that the defendant intended that any sale made by Shively should not become valid or binding until ap-

proved or ratified by the county court, though the burden was on the petitioner to prove, at least by a preponderance of the evidence, that such was not a fact. Realizing that my view of the testimony is not in accord with that stated in the majority opinion, I must necessarily quote extensively from statements of several witnesses relating to such controlling fact.

Mr. Shively testified: "Q. I will ask you, Mr. Shively, if Mr. Ellis didn't tell you that these cattle were to be sold subject to the approval of the county court? A. It was my understanding it would have to be approved by the county court, or sold — Q. (Interrupting) Or it was no sale? A. Yes, sir." He also testified: "Q. Was it distinctly understood by you that in the event that the different sales were not ratified by the county court that the stock was not to be ultimately sold and would be returned? A. I understood it that way, yes, sir." He further testified, in answer to questions asked by counsel for petitioner, that "I had an understanding if something went wrong or if the whole thing didn't go through with or, I don't know how you would want me to put it, that the men would voluntarily release their stock. In other words, you might say it was on sort of a condition that if everybody didn't approve of it, why there wouldn't be no argument, no question as to whether to bring it back or not. Q. That understanding you have just referred to, is that the one you had with Mr. Ellis? A. That's right. That's right." The majority opinion points out no evidence in contradiction of these clear statements, and I find none. In view of such statements, it may be immaterial as to what Shively actually told the purchasers concerning the necessity of confirmation of the sales by the county court, since that would constitute action of Shively beyond the control of defendant, and was not even attempted to be proved as being within the knowledge of defendant. The testimony of the purchasers, however, clearly corroborates the testimony of Shively.

The only purchasers of livestock questioned as to whether there was a definite understanding between

Shively and such purchasers as to the return of the livestock in the event the sales were not confirmed by the county court, were Graham, Sullivan and Hunter. Graham was asked and he answered the following questions: "Q. I would like to ask you this: were you under the impression that in the event that this sale was not ratified by the county court that the cattle would have to be returned? A. Yes, sir. Q. You were under that impression? A. Yes, sir." He was asked on redirect examination by petitioner, and answered the following questions: "Q. I believe you replied to a question asked by Mr. Quinlan that you at some time were under the impression that the sale would not be final until confirmed by the county court. Now, when were you under that impression? A. I believe that is what he did say. I don't know just what the conversation was about. I bought the cattle in good faith and that is all there is to it. Q. Are you testifying that at the time you did buy Mr. Shively made mention of the fact that the sale was to be later confirmed by the court? A. That's right. Q. Was that before or after you had delivered your money to him? A. Well, that was before."

Sullivan was asked the following questions and gave the following answers: "Q. I will ask you whether or not it was your understanding that if the county court did not ratify this sale — or the sale of cattle to Banks, Graham, yourself, and Werner, that the sale would not be completed and the cattle would have to be returned? A. Well, I understood that * * *". Hunter, who purchased part of the livestock from Sullivan, was asked the following question, to which he gave the following answer: "Q. Was it your understanding that in the event that Sullivan couldn't get title to these cows or that they reacted that they were to be returned? A. Yes, sir."

In view of such unanimity of witnesses and uncontradicted testimony, I can not possibly reach the conclusion that defendant in any wise exceeded his authority or committed any official misconduct amounting to malfeasance. The only basis I find in the testimony, or in the

majority opinion, which possibly tends to support the conclusion of guilt, rests upon inferences unwarrantedly drawn from the facts relating to the return of the livestock by the purchasers, on request and information to the effect that the sales would not be confirmed by the county court. Can it not be as reasonably and logically contended that such action on the part of each and every purchaser, without question or hesitation, confirms, rather than refutes, the testimony to the effect that it was fully understood and agreed that such stock was to be returned in the event of the very contingency which happened? Sales of livestock over a period of at least twenty seven years had been consummated in the same general manner as testified to by the superintendent of the farm, a witness for, and not in the least prejudiced against, petitioner. The evidence of the other two members of the county court makes it clear that the sales in question would have been confirmed except for the matters arising after the transfer of possession of the property conditionally sold. It is not even contended that defendant received, or expected to receive, or that any purchaser or other person intended or expected to pay him, anything of value in connection with any of the transactions. All who testified as to the matter testified to the effect that the sales were made in good faith and that the prices paid by the respective purchasers were not less than the fair and reasonable value of the livestock purchased. Mention is made in the majority opinion of an offer of two hundred dollars for one cow. The offer was not made as to any cow owned by the county, and was made before the sale of the county owned livestock was contemplated, and concerning a wholly different type of stock. Mention is also made of the fact that Sullivan conditionally sold some of the stock involved at a price greater than that paid. The Sullivan sale, however, was a "time" sale, and other facts appear to show that his profit was not unreasonable. Even the majority opinion ventures that "The evidence shows clearly that, if there had been no adverse publicity which immediately followed * * * the trans-

action, at least as far as the defendant was concerned, would have remained in force and effect * * *". All agree, of course, that public officers should act judiciously and cautiously in the discharge of their official duties and never, in any manner, attempt to enrich themselves, in the least degree, to the injury of the public. They undoubtedly should be held to strict compliance as to all official duties. No inference is intended, of course, as to the propriety of the "adverse publicity" mentioned. Justifiable criticism is not only allowable under our form of government, but is, perhaps, the most effective weapon against those few public officials who would neglect, debase or debauch public offices. Conviction of wrongdoing, however, should not rest on criticism, just or unjust, suspicion, speculation, or mere inferences arising from assumed, unproved facts. The interest of the public, the social and civic stability of government, demand more. In transactions of such business as here involved, however, it will be agreed, I believe, that a public official must be allowed, and has, some discretion as to how and when such business should be transacted, so long as no positive rule of law is violated. In truth, it would appear impossible for county courts to function efficiently if every step of the negotiation of such a transaction as here involved must first be considered and approved by the court, duly convened, before a sale can be conditionally agreed upon. The charge of malfeasance against a public officer should not be sustained unless substantial evidence supports the charge. See *State ex rel. Rogers* v. *Board of Education of Lewis County,* 125 W. Va. 579, 25 S. E. 2d 537; *Shields* v. *Romine,* 122 W. Va. 639, 13 S. E. 2d 16; *Hamrick* v. *McCutcheon,* 101 W. Va. 485, 133 S. E. 127; *Painter* v. *Heironimus,* 97 W. Va. 579, 125 S. E. 525; *Dawson* v. *Phillips,* 78 W. Va. 14, 88 S. E. 456.

Being of the views indicated, I respectfully dissent. I would reverse the judgment of the Circuit Court of Cabell County, removing defendant from office.