GEORGE LOVE *et al. v.* NEW RIVER & POCAHONTAS CONSOLIDATED COAL COMPANY *et al.*

(No. 8608)

Submitted September 7, 1937. Decided September 28, 1937.

*Love & Love* and *C. B. Vickers,* for appellants.
*Mahan, Bacon & White,* for appellee New River & Pocahontas Consolidated Coal Co.

HATCHER, JUDGE:

This suit was brought in October, 1934, by George Love, a citizen and taxpayer of Fayette County to enjoin

the New River & Pocahontas Consolidated Coal Company, as assignee, from collecting, and the sheriff from paying, certain Fayette County road fund drafts issued April 3, 1929, amounting to $52,492.29. A temporary injunction was granted. The defendant Coal Company (hereinafter called the Company) answered, praying for affirmative relief against the county court of Fayette County, and the court was made a party. Proof was taken. Upon the final hearing, the injunction was perpetuated as to drafts issued to one J. H. Harvel, amounting to $16,-038.02, and was dissolved as to drafts issued to one Ray Gentry, trustee, amounting to $36,429.27. Love and the county court appeal from the latter ruling; the Company alleges cross-error as to the former, and also as to partial disallowance of interest.

Harvel was a contractor. The drafts issued to him were in payment of monthly force accounts plus 10% for paving work done by him on a public road in June to October, 1928, inclusive. He did other public road work under a direct contract with the Company; but he did the work in question under employment by the county engineer on "a month to month basis" with the express agreement that the cost should not exceed a stipulated unit price. The county court had seemingly given the county engineer a free hand in road construction. After the Harvel monthly accounts were checked by the county engineer and approved by him and the county court, Harvel assigned his claims thereon to the Company, and received from it in consideration thereof their face value in cash. The county engineer testified that the Company was "not obligated" to make these advancements to Harvel. The latter testified that while he *looked* to the Company—"was relying" on it—to make these advancements, his understanding with it did not include any definite period, and "could have been cancelled at any time". If so, he said he would have stopped work.

The drafts issued to Gentry were for advances by the Company on supplies, road building materials, salaries of guards, and other expenses in connection with public road work by large forces of county prisoners from July,

1928, to January, 1929. These advancements were made through Gentry to the county engineer. From month to month he presented the Company with estimated costs of the work done, and the Company, as he expressed it, "purchased" the estimates. He then used the money so furnished to pay the costs. He testified that there was no agreement in advance between himself and the Company; that it was not in any way obligated to purchase the estimates; and that when one was presented, the Company, as he said, "had the privilege of advancing me the money to cover it, or turning it down." The county court had given him express authority to use prison labor on the roads and in connection therewith to establish prison road camps. The expenses of this labor involved multitudinous items, and for convenience, Gentry, a deputy clerk of the county court, was used as trustee to assemble the items monthly and to receive the drafts therefor on behalf of the Company.

These two transactions are explained in this manner. No tax collections for the fiscal year 1928-9 were made until November, 1928, and only "a small part" of the taxes due were paid before January, 1929. Consequently, there was no actual cash in the county treasury available for the work in question during most of the time of its performance. The Company was anxious to have the work proceed. The county engineer testified that he could not have prosecuted the work without cash; and so instead of trying to secure money on county drafts, which would have borne interest, he arranged with the Company to advance cash on the work accounts, "in order that the county might save interest charges."

The county court records have no minutes of the manner in which this work was financed or performed. There is no question, however, about the quality of the work, nor the advances of the Company thereon. The items of the work accounts are not seriously questioned. The real controversy concerns only the obligation of the county court to pay for the work.

For several years prior to 1928, the county court had entertained an ambitious road building scheme, far be-

yond its current resources. In consummating this scheme, the court had permitted several parties, including the Company, to advance money for road building with the expectation that the court would make repayments later whenever its resources should permit. The origin of this arrangement is nebulous and at best it was only *a gentlemen's agreement.* If such, it involved the levies of future years, and its illegality under Code 1923, Chapter 28 A, Section 12, is conceded by the Company, and an unpaid balance of more than one hundred and eighty-five thousand dollars advanced by it under the arrangement is regarded as "gone with the wind".

Appellants contend (a) that the transactions of 1928 were under a gentlemen's agreement or are tainted with its illegality; (b) that levies were not available to pay the drafts in question; but, if so (c) that it was not permissible for the county court "to receive advancements during a period when taxes had not as yet been collected, nor * * * borrow funds (without popular permission) during such a period"; (d) that the only method lawful under the statute was that "Drafts might have been issued by the county court before taxes were collected and these drafts presented to the Sheriff and endorsed for interest, and then the drafts paid when taxes had been collected"; and (e) that the drafts herein are barred by the statute of limitations. The Company contends (1) that the drafts were not for advancements under the gentlemen's agreement, but were for advancements under specific independent contracts; (2) that when the road estimates were purchased in 1928, the road levies for the fiscal year 1928-9 were potentially available to pay the estimates, and after July 1, 1928, the county court, through its agent, the road engineer, could lawfully incur obligations for road work within the levies of the fiscal year of 1928-9 prior to their actual collection; (3) that it was not only the duty of the county court to build roads, but it was mandatory upon the court under Code 1923, Chapter 43, Sections 48 and 49, as amended by Acts 1925, Chapter 17, to work county prisoners on the roads and to arrange for payment of the expenses of such labor;

and (4) that the Company has whatever rights against the county court Harvel had, and were had by each of the many persons who furnished supplies to the prisoners or who performed services for the county court in connection with the prison labor.

We are of opinion that the contentions of the Company are generally sound. Code 1923, Chapter 43, Section 150, contemplates that a county court may have work done on a road otherwise than by a contract with "the lowest responsible bidder", and if so, that the work shall be done under the direction of the county engineer. There is no legal impediment to a county court (with sufficient funds lawfully at its disposal) having such work done by a contractor upon a force account, under an agreement restricting the cost to a certain unit price, and under the direction of the county engineer. Irrespective of the penumbra of any gentlemen's agreement between the county court and the Company, the effect of the arrangement between Harvel and the Company was that he, not the county court, was directly financed by the Company. And there is nothing unlawful in the mere fact that a contractor requiring immediate cash assigns his claims against the county court to a third person, willing to wait payment. Since the county court was required by the statute to work the prisoners on the road, and did not have the requisite cash to do so, there was no inherent illegality in the Company, without monetary profit of any kind to itself, advancing the cash.

The first work in question was done by Harvel on the force account in June, 1928, and amounted to $3,133.80. This force account work, being merely on "a month to month basis" and for no definite time or project, is separable into monthly contracts. The essential validity of each contract depends on the condition of the county treasury when that contract was made. The statute is unequivocal. Code 1923, Chapter 28 A, Section 12, makes unlawful any contract of a county court "the performance of which, in whole or in part, would involve the expenditure of money in excess of funds legally at the disposal" of the court. When the fiscal year of 1927-8 closed on

June 30, 1928, there was a balance remaining in the road fund of $17,253.38 and chargeable to the fund were outstanding orders of $3,806.63 and current road accounts due and unpaid of $23,813.30. The fact that the fund was in debt on June 30th, does not affect the validity of the June force account contract. It is valid if, when made, there was available money in the fund above the county court's other obligations, to meet it. *Doss* v. *O'Toole*, 80 W. Va. 46, 92 S. E. 139. Sometime prior to June 30, 1928, the county court had road money lawfully at its disposal; but the date its contracts exceeded the balance of $17,253.38 does not appear. Neither does the exact date appear when the county engineer contracted with Harvel to do the work performed in June. Consequently, we are unable to say whether or not the Harvel June contract was made at a time when the condition of the road fund warranted the contract, and the cause is remanded for the development of that subject. All of the remainder of the work in question was done between July 1st and December 31st, 1928. After July 1st, the road levies for the fiscal year 1928-9, which amounted to more than one hundred thousand dollars, were lawfully at the disposal of the court and validated the contracts for the remainder of the work.

An unofficial audit of the road fund for the fiscal year 1928-9 purported to show that the fund was overdrawn on April 3, 1929, the day the drafts in question were issued. If so, the drafts themselves were unlawful, under the statute, Section 12, *supra*. That audit, however, assumes to make certain large deductions from the fund, which very properly were not made in the official audit of this fund by the State Tax Commissioner. Therefore, the latter must be preferred. It does show an overdraft at the close of the fiscal year, but clearly indicates that a like condition did not exist on April 3, 1929. The official audit discloses that a balance of $34,722.70 had not been withdrawn from the fund on June 30, 1929, and that $23,500.00 had been transferred from this fund (in March, 1929) to the general county fund. Code 1923, Chapter 28 A, Section 11, made this transfer illegal and

it should be treated as remaining in the road fund. Between April 3, 1929, and June 30, 1929, orders amounting to $13,864.42 were issued by the county court and were paid out of the fund. The sum of these three items is $72,087.12 which should have been available on April 3, 1929, to meet the instant orders of $52,492.29; thus they were not illegal under the statute.

The plea of the statute of limitations is based on the theory that the claims of the Company are at best but "verbal contracts" and more than five years elapsed before the Company attempted to establish their validity. This position ignores the fact that all the drafts, with the possible exception of the one in payment of the June, 1928, force account, were issued in settlement of valid claims, and that collection of the drafts themselves is not barred in five years.

The circuit court allowed interest on the Gentry drafts from May 16, 1929, "for a period of one year and six months, thence ensuing." Both the Gentry and the Harvel drafts were presented to the sheriff for payment, shortly after the drafts were issued, and were in his hands on May 16, 1929. On that day, the same plaintiff herein filed a bill in the circuit court against the Company and the then sheriff upon the identical subject matter as the instant suit, and seeking there the same relief as here. A restraining order was entered on that day, containing the usual provision that the injunction should not take effect until bond should be given. The record herein does not show that the bond was given, but does show that a copy of the order was not served on the defendants, and that process on the bill did not issue. The defendants are said to have known of the suit and the order. The decree of the circuit court and the briefs of counsel herein treat the conditional order of May 16, 1929 as absolute, and as restraining the Company from collecting and the sheriff from paying the drafts. When the drafts were presented to the sheriff he should have had sufficient money on hands to cash most, if not all, of them. He should then either have paid each draft or marked it "presented for payment" as required by Code

1923, Chapter 39, Section 39. This duty apparently devolved upon him before the restraining order of May 16, 1929, was entered and if no injunction bond was given, he was not relieved of that duty nor from the penalties for failure thereof prescribed by the above statute. If a valid bond was given, then the question of the liability of the bond for the interest would arise. The sheriff in office in 1929 is not a party to the instant suit. From all which it appears that the adjudication on the interest was premature. Consequently, the ruling of the circuit court thereon is set aside; and if any party desire, further proof may be taken on the question of interest and other parties, if necessary, may be brought into the suit.

The decree of the circuit court so far as it enjoins collection of the Harvel drafts is also set aside; but so far as it dissolves the injunction against collection of the Gentry bonds, is affirmed, and the cause remanded.

*Affirmed in part; reversed in part and remanded.*