118 S.E.2d 347 (1960)
Henry J. EDWARDS et al.
v.
C. W. HYLBERT, etc., et al.
No. 12066.
Supreme Court of Appeals of West Virginia.
Submitted October 4, 1960.
Decided December 6, 1960.
Rehearing Denied February 13, 1961.
Concurring Opinion February 14, 1961.
*348 Wm. Bruce Hoff, Daniel A. Ruley, Jr., George W. Hill, Jr., Parkersburg, for plaintiffs in error.
Richard F. Pence, Pros. Atty., Wood County, Jack L. Miller, Asst. Pros. Atty., Wood County, Parkersburg, for defendants in error.
CALHOUN, Judge.
This proceeding was instituted pursuant to Code, 6-6-7, and Code, 11-8-31, as amended, in the Circuit Court of Wood County by Henry J. Edwards, Esther V. Van Fossen, Corlean Virginia Mayhew, Ralph Clifton Long, and Dorothy H. Leon, who will be referred to herein as the "petitioners", against C. W. Hylbert, Mayor of the City of Parkersburg, and R. R. Nuzum, James M. Beckett, Jr., Cecil C. Coffield and R. W. Carr, councilmen of that city, who, with the exception of R. W. Carr, will be referred to herein as the "respondents". The purpose of the proceeding is to oust or remove from office the municipal officials named above. Prior to the date of the institution of the proceedings R. W. Carr became mentally and physically ill on June 27, 1959, to such a degree that he was unable to participate or to testify as a witness in the proceedings in the trial court. Under such circumstances the case was continued indefinitely as to him but proceeded to final judgment as to the mayor and the other three members of the city council.
The case is before this Court on appeal from a final order entered by the Circuit Court of Wood County on July 30, 1960, by which the mayor and three councilmen were removed from office and by which the execution of such final judgment was suspended for a period of sixty days in order to enable the respondents to apply to this Court for an appeal. Subsequently, this Court suspended the judgment of the trial court pending a final determination of the matters arising on such appeal.
The basic charge alleged as a ground for removal is that during the 1958-59 fiscal year the respondents purchased or contracted for the purchase of seven automobiles to be paid for, and which actually were paid for as items of current expense during the ensuing 1959-60 fiscal year. The case was heard in the lower court on the basis of twelve several specifications contained in the petition for removal filed therein, which, briefly summarized, are as follows:
Specification Number One charges that the respondents "wilfully", and Number Two charges that they "negligently" contracted a debt and incurred an obligation on behalf of the City of Parkersburg in the fiscal year 1958-59, to be paid for in the fiscal year 1959-60, in that on May 12, 1959, the council passed a resolution for the purchase of an 88 Oldsmobile automobile for the use of the department of public safety.
Specification Number Three charges that the respondents "wilfully" and Number Four charges that they "negligently", in the fiscal year 1958-59, contracted a debt and incurred an obligation to be paid in the 1959-60 fiscal year, in that on May 19, 1959, the council passed a resolution for the purchase of a 98 Oldsmobile automobile for the use of the department of streets.
*349 Specification Number Five charges that the respondents "wilfully" and Number Six charges that they "negligently", in the fiscal year 1958-59 contracted a debt and incurred an obligation to be paid in the fiscal year 1959-60, in that on June 30, 1959, the council passed a resolution authorizing the purchase of a Chrysler automobile for the use of the department of public affairs.
Specification Number Seven charges that the respondents "wilfully" and Number Eight charges that they "negligently" contracted a debt and incurred an obligation in the 1958-59 fiscal year to be paid in the 1959-60 fiscal year in that they "allowed and permitted" H. E. Martin, chief of police, to incur an indebtedness, expense and obligation for the purchase of four new Ford automobiles for the police department.
Specification Number Nine charges that the respondents "wilfully" and Number Ten charges that they "negligently" included in the municipal council levy estimate for the fiscal year 1959-60 obligations or debts incurred in the preceding fiscal year, specifically described as an item of $2,472 for the 88 Oldsmobile, $2,495 for the 98 Oldsmobile, $2,395 for the Chrysler and $5,000 for the four Ford automobiles.
Specification Number Eleven charges that the respondents "wilfully" and Number Twelve charges that they "negligently" did, during the month of June, 1959, incur obligations on behalf of the city in excess of funds available, in that they voted to expend the sum of $49,314.47 in excess of funds available, in addition to obligations incurred in relation to the seven automobiles as previously stated herein.
The respondents were elected on April 7, 1959, for three-year terms, and assumed the duties of their several offices on April 20, 1959. C. W. Hylbert is a first-term mayor and the head of the Department of Public Affairs of the City of Parkersburg. R. R. Nuzum is a second-term, but not a consecutive-term, councilman, and is head of the Department of Public Safety of the City of Parkersburg. James M. Beckett, Jr., is a second-term councilman, and head of the Department of Streets of the City of Parkersburg. Cecil C. Coffield is a sixth-term councilman, and is head of the Department of Waterworks and Sewers of the City of Parkersburg. R. W. Carr is a third-term councilman and, prior to his illness, served as head of the Department of Accounts and Finance of the City of Parkersburg.
At the first meeting of the newly-elected officials held on April 21, 1959, the respondents apparently had before them the monthly financial report of the City of Parkersburg for the month of March, 1959, disclosing small unexpended balances in various subdivisions of the general fund but an overdraft in that fund for the fiscal year to that date amounting to the sum of $23,905.43. The monthly financial report for April, 1959, received by the respondents late in May, 1959, disclosed an overdraft in the general fund amounting to $34,142.81. The monthly financial report for May, 1959, received by the respondents during the last week of June, 1959, disclosed a balance in the general fund amounting to $9,699.96. The monthly financial report for June, 1959, received by the respondents during August, revealed that the general fund was overdrawn, as of June 30, the end of the 1958-59 fiscal year, in the amount of $55,384.86.
On or about May 4, 1959, respondent R. R. Nuzum, councilman and head of the department of public safety, negotiated with Hupp & Wharton Cadillac-Olds Company for the purchase of a new 1959 model 88 Oldsmobile automobile for the purchase price of $3,872, subject to a credit of $1,400 for a 1957 Ford automobile owned by the city, leaving a cash cost difference of $2,472. The invoice from Hupp & Wharton Cadillac-Olds Company had typewritten on its face: "To be paid for by City of Parkersburg on or about July 10, 1959." The city received the new Oldsmobile and on May 9, 1959, Mayor Hylbert transferred the title to the 1957 Ford to Hupp & Wharton Cadillac-Olds Company. The city was issued a certificate of title for the new *350 Oldsmobile by the Department of Motor Vehicles of West Virginia on May 11, 1959. On May 12, 1959, the council passed a resolution on second and final reading, approving the purchase of the new Oldsmobile and directing the payment of the cash difference at an indefinite, unspecified date, but specifically "upon the approval of the invoice of same by R. R. Nuzum." On July 21, 1959, within the new fiscal year, R. R. Nuzum approved in writing the invoice for the new 88 Oldsmobile, and directed that it be paid. Accordingly, the cash difference was paid on July 22, 1959, from the general fund in the amount of $2,472.
On or about May 5, 1959, respondent James M. Beckett, Jr., councilman and head of the department of streets, negotiated the purchase on behalf of the city of a new 98 Oldsmobile automobile from Hupp & Wharton Cadillac-Olds Company at a total cost of $4,000, subject to a credit of $1,505 for a 1957 Mercury belonging to the city, leaving a cost difference of $2,495. The invoice from Hupp & Wharton Cadillac-Olds Company bears on its face the following typewritten language: "To be paid for by City of Parkersburg on or about July 10, 1959." The city received the new 98 Oldsmobile; the mayor transferred title to the 1957 Mercury to Hupp & Wharton Cadillac-Olds Company on June 8, 1959; and the city was issued a certificate of title for the new 98 Oldsmobile by the department of motor vehicles on May 11, 1959. On May 19, 1959, the council passed on second and final reading a resolution, approving the purchase of the new 98 Oldsmobile and directing payment of the cash cost difference amounting to $2,495 from the general fund at an unspecified future time, but specifically "upon the approval of the invoice of same by James M. Beckett, * *." On July 22, 1959, James M. Beckett, Jr., approved in writing the invoice and directed that the sum of $2,495 be paid. Accordingly, that sum was paid from the general fund on July 23, 1959.
During May, 1959, Hobart E. Martin, chief of police, negotiated the purchase on behalf of the city of a new 1959 Chrysler automobile from Mullen Motors at a total cost of $3,751, subject to a credit of $1,356.90 for a 1956 Mercury automobile belonging to the city, leaving a difference of $2,395. The city received the new Chrysler prior to May 25, 1959; transferred title to the 1956 Mercury to Mullen Motors on May 15, 1959; and was issued a certificate of title for the new Chrysler by the department of motor vehicles on May 25, 1959. On June 30, 1959, the last day of the current fiscal year, the council passed, on second and final reading, a resolution approving the purchase of the new 1959 Chrysler, and directing payment of the cash difference of $2,395 from the general fund, at an unspecified future date, but specifically "upon approval of the invoice of same by Mayor C. W. Hylbert." On August 31, 1959, Mayor C. W. Hylbert approved in writing the invoice for the new 1959 Chrysler, and directed that the sum of $2,395 be paid and charged to account number 10 of the general fund. The sum of $2,395 for the purchase of the Chrysler was paid from the general fund on September 16, 1959, as a current expense for the 1959-60 fiscal year.
During the last of May, 1959, Hobart E. Martin, chief of police, solicited and received bids on behalf of the city from perhaps six automobile dealers for four new automobiles to be exchanged for four 1957 Pontiac police cruiser cars owned by the city, and received a low bid of $5,000 from Dils Motor Company. On June 24, 1959, the mayor transferred to Dils Motor Company title to the four 1957 Pontiac automobiles previously owned by the city; the city received the four new 1959 Ford automobiles; and on the 19th and 29th days of June, 1959, the city was issued certificates of title from the department of motor vehicles for the new 1959 Ford automobiles. The council did not adopt any formal resolution in relation to the *351 new 1959 Ford automobiles purchased from Dils Motor Company during the 1958-59 fiscal year nor at any other time until September 8, 1959, when the council, on second and final reading, passed a resolution approving the purchase of the four new 1959 Fords from Dils Motor Company, and directing the payment of the cost difference amounting to $5,000 as a current expense item for the 1959-60 fiscal year, to be charged to the general fund. On October 26, 1959, Dils Motor Company was paid by the city the sum of $5,100 by a check signed by C. W. Hylbert, who testified that he felt that it would be right and proper to pay Dils Motor Company interest for four months, amounting to $100, inasmuch as it had waited that long to receive the $5,000.
Each of the respondents, C. W. Hylbert, Mayor, and R. R. Nuzum, James M. Beckett, Jr., and Cecil C. Coffield voted in the affirmative in formal council meetings in relation to the four automobile transactions detailed herein; that is, in relation to the 88 Oldsmobile, the 98 Oldsmobile, the Chrysler and the four Fords.
One thing made clear beyond question by the evidence is that the four automobile transactions involving the 88 Oldsmobile, the 98 Oldsmobile, the Chrysler and the four Fords were completed within the 1958-59 fiscal year to the extent that the city received and commenced using the seven new automobiles; the seven used automobiles previously owned by the city were transferred and delivered promptly to the several automobile dealers; the four Fords when received by the city were specially equipped to render them fit for use as police cruisers; titles were transferred during the fiscal year of 1958-59 in relation to all such automobiles, new and used; the trade-in value in each instance was fixed by negotiations; and the resulting cost to the city was agreed upon. One other fact equally clear from the evidence is that none of the seven new automobiles was paid for by the city during the 1958-59 fiscal year, nor from the funds available for that year; but, on the other hand, all were paid for by the city as items of current expense during the ensuing 1959-60 fiscal year from funds available for that fiscal year. It is equally clear that the four several purchase prices were not included under the category of "outstanding orders" in the 1959-60 levy estimate.
Formal resolutions passed by the council during the 1958-59 fiscal year in relation to the two Oldsmobiles and the Chrysler were prepared in the usual course by the acting city solicitor. The resolution in relation to the four Ford automobiles, passed on second reading on September 8, 1959, was meticulously prepared by the acting city solicitor in collaboration with one of counsel previously employed to represent the respondents in these removal proceedings. Subject to the single qualification that the formal resolution in relation to the four Ford automobiles was not passed on first and second reading until September 1 and September 8, 1959, all of the four contracts for the purchase of the seven automobiles on behalf of the city were completed, consummated, and executed within the 1958-59 fiscal year, except for the payment by the city of the four several agreed purchase prices.
In their brief filed herein counsel for the respondents point out that actual general fund receipts for the 1958-59 fiscal year were $1,101,340.63 or $63,298.37 less than estimated receipts for that year; that the city during such fiscal year incurred obligations, including those in relation to the two Olds mobiles and the Chrysler, in the sum of $1,162,241.99 or $60,901.16 in excess of actual receipts, but $2,397.01 less than estimated receipts. It is a fact, nevertheless, that if the $5,000 purchase price of the four Fords is considered an obligation incurred during the 1958-59 fiscal year, then it follows that the obligations incurred in that fiscal year exceeded even the estimated receipts to the extent of $2,602.99. In that connection, however, counsel for the respondents contend that no contract was made and no obligation was incurred on behalf of the city *352 within the 1958-59 fiscal year in relation to the four Fords because of the legal proposition that a fiscal body, such as a municipal council, can act only as a body and the fact that the council as such took no formal action in relation to such Fords until September 1 and 8, 1959, within the ensuing fiscal year.
It is true that the members of a fiscal body such as a municipal council may act only as a group, and that such members can not bind the fiscal body by acting separately and individually. Wysong v. Walden, 120 W.Va. 122, pt. 10 syl., 196 S.E. 573; Cade v. City of Belington, 82 W.Va. 613, pt. 1 syl., 96 S.E. 1053; Appalachian Electric Power Co. v. City of Huntington, 115 W.Va. 588, 177 S.E. 431; Daugherty v. Ellis, 142 W.Va. 340, pt. 4 syl., 97 S.E.2d 33. See also Earl T. Browder, Inc. v. County Court of Webster County, 143 W.Va. 406, 102 S.E.2d 425, dealing with a contention that a county court, in the absence of an express contract, should be held liable on the theory of unjust enrichment. Bearing in mind the undisputed facts that during the 1958-59 fiscal year there was a complete transfer of four used automobiles belonging to the city in exchange for four new Fords, followed by the acquisition of proper certificates of title through the department of motor vehicles to consummate such transfer or exchange; and bearing in mind that the four new, specially equipped Fords were received and used by the city through its police department within such fiscal year, it would appear to be somewhat anomalous to permit the respondents to establish the propriety and legality of such transactions by an assertion that it was all done and consummated initially on behalf of the city without lawful authority or in the absence of a legally binding contract. If such a contention were given legal sanction, municipalities would be given a green light wilfully to incur obligations clearly in excess of funds available in one fiscal year and to pay for them from the funds of the ensuing fiscal year by the mere expedient of delaying formal and legal action of the council thereon until the latter period. A similar contention, made at a time when the pertinent statute contained slightly different language, was rejected by this Court in the case of Shonk Land Co. et al. v. Joachim et al., 96 W.Va. 708, 716-717, 123 S.E. 444, 447, as follows:
"* * * The legislative policy is clear, and the statute must not be warped by construction to defeat it. The phrases `funds legally at the disposal of the fiscal body,' and `which cannot be paid out of the levy for the current fiscal year,' refer to the time when the contract is made, and not in futuro. No contract is valid which will bind the levies of future years, without authority from the people. Davis v. [Wayne] County Court, 38 W.Va. 104, 18 S.E. 373; List v. City of Wheeling, 7 W.Va. 501; Spilman v. City of Parkersburg, 35 W.Va. 605, 14 S.E. 279. But it is argued that this was not a contract for seats and desks entered into on April 29, 1921, which would bind the levy of the fiscal year 1921-22, but simply an `arrangement' by which the purchase and delivery of the goods could be expedited and made available for use when the schools started, and in truth it was a contract for the year 1921-22, and expressly made payable out of the levies for that year. It bears all the formalities of an executory contract. If by an `arrangement' funds could be thus obligated (without funds in the hands of the fiscal body) and payable in the next or subsequent year, payable as the future years came on, the levies of the future could be mortgaged by `arrangements,' bringing about the former chaotic condition in fiscal affairs, which the legislature intended to prevent. An `arrangement' by which one person buys and another sells property at a stipulated price, the payment to be made at a time stated, would be viewed as a contract in the eyes of the law. This so called `arrangement' was illegal and void under *353 the statute, either as an express or implied obligation to pay money. The funds available for that purpose were exhausted at the time it was made. * * * The statute would be entirely emasculated if the board could, by putting off the time of payment under an illegal contract made void and prohibited as a misdemeanor by law, vivify the contract by the issuance of an order in the next year, or then providing for its payment."
On behalf of the respondents, it is urged that they acted upon advice of counsel, and that, therefore, under the authority of the case of Hamrick v. McCutcheon, 101 W.Va. 485, 133 S.E. 127, it can not be said that they acted negligently or wilfully. The evidence fails to disclose that the respondents sought or received any advice of counsel in relation to the four automobile transactions at or prior to the time they took place or at any other time until the latter part of July. The legal proceedings to oust the respondents were commenced initially on July 29, 1959. Thereafter the respondents received the advice of counsel employed to represent them in such ouster proceeding. Within a period of a few days prior to July 29, 1959, the Prosecuting Attorney of Wood County and his assistant met with the respondents and advised them to return the seven automobiles to the dealers from whom they were acquired. At that time the respondents sought and received advice from Charles V. Renner, acting city solicitor. John S. Cather, city solicitor, was on vacation from July 7 to August 20 or 21, 1959, but after his return he conferred with the respondents. Robert W. Burk assisted the respondents in the preparation of the 1959-60 levy estimate, and in that connection he conferred with the respondents on several occasions beginning during the month of July. Attorney Burk in his testimony makes it evident that, at the time he prepared the levy estimate, he was not fully advised of all pertinent facts in relation to the four automobile transactions. John S. Cather, city solicitor, testified that not until about August 20 did he know of the typewritten notations on the invoices for the Oldsmobiles, and that no advice from him was sought by the respondents prior to his return from his vacation about August 20, except that he prepared the resolutions in relation to the two Oldsmobiles and the Chrysler. It is apparent, therefore, that the respondents have failed to establish that they sought or received any prior or contemporaneous advice of counsel in relation to the transactions, the propriety and legality of which are challenged in this proceeding, except to the limited extent that they may have been advised by Robert W. Burk in connection with his preparation of the 1959-60 levy estimate. This is true, notwithstanding the fact that prudence and reasonable caution would have dictated that the respondents avail themselves of the advice of the city solicitor in connection with the automobile transactions during May and June, 1959, when they were being negotiated and consummated.
Harold A. Hupp, of Hupp & Wharton Cadillac-Olds Company, testified as follows in relation to the negotiations by R. R. Nuzum for the purchase of the 88 Oldsmobile:
"A. At that time Mr. Nuzum said that he would like to have a new car and if I could trade with him and accept payment later, why, he thought we could make a deal, and I told him it was perfectly all right, I would be glad to.
"Q. Was any date for payment mentioned, sir? A. I believe I typed it or had my office girl type it on the bill. I believe it was on or about the 10th of July, 1959." (Italics supplied.)
Sharlene George, acting city clerk from April 7, 1959, until she became city clerk on January 6, 1960, testified that at the regular meeting of the council held on May 5, 1959, the 88 Oldsmobile invoice, including the typewritten notation thereon, was read by her to the respondents.
Paul Dawkins, a salesman for Hupp & Wharton Cadillac-Olds Company, in relation *354 to the negotiations by James M. Beckett, Jr., for the purchase of the 98 Oldsmobile, testified as follows:
"A. Mr. Beckett came in and said that he understood that Mr. Nuzum was purchasing a new automobile through the city and asked if he could get one on the same terms as Mr. Nuzum.

"Q. What, if anything, did you do then, sir? A. I told him that I didn't know the terms, that Mr. Nuzum had discussed that part with Mr. Hupp, so I went in and asked him and he said yes.
"Q. Did you then talk to Mr. Beckett again after you talked with Mr. Hupp? A. Yes, sir.
* * * * * *
"A. Well, I came back and told Mr. Beckett that it could be arranged, the same setup as Mr. Nuzum's, and he asked that we look at his car and see what kind of trade in could be arranged and how the deal would be." (Italics supplied.)
Sharlene George testified that the 98 Oldsmobile invoice was before the council in regular meeting on May 12, 1959.
Gorge Breckenridge, sales manager for Dodge-Plymouth-Chrysler-Imperial agency, in relation to the negotiations by Police Chief Hobart Martin for the purchase of the Chrysler, testified as follows: "* * * Well, my understanding was, if we were successful in this bid, that we would not receive the money for this car or for this transaction until after the first of July, 1959." (Italics supplied.)
Howard F. Nestor, a salesman for Dils Motor Company, testified that Chief Martin returned to advise that the bid of Dils Motor Company for the trade of four new cars was the lowest, and after detailing his conversations with Chief Martin, the witness stated: "I assumed we made a sale * * *." On the contrary, the resolution prepared with the counsel for the respondents after the institution of the initial ouster proceedings, and which was passed on second reading on September 8, 1959, treats the bid of Dils Motor Company as a mere unaccepted offer. A portion of the language of the resolution is as follows:
"Whereas on June 20, 1959, Dils Motor Company, acting in advance, but in anticipation, of councilmanic action accepting its said offer, made delivery to the Police Department of said city of said four Ford automobiles, and the same have ever since been and are now in use by said department; and,
"Whereas, on June 24, 1959, C. W. Hylbert, Mayor of the City of Parkersburg, acting in advance, but in anticipation, of councilmanic action accepting the said offer of Dils Motor Company, transferred the title to said four Pontiac automobiles to said company;
* * * * * *
"Now, Therefore, Be It Resolved By The Council Of The City Of Parkersburg that the Department of Public Affairs be, and the said department is hereby, authorized, for and in behalf of The City of Parkersburg, to consummate the purchase of said four Ford Automobiles, for the use of the Police Department of said City, from Dils Motor Company in accordance with the terms of the offer of said company of May 11, 1959, which offer is hereby accepted, * * *."
The respondents, in an effort to justify the obvious fact that they expended money and incurred obligations in excess of funds available, assert that they relied on assurances by R. W. Carr, councilman and head of the department of accounts and finance, to the effect that receipts were adequate to warrant such expenditure of money and incurrence of obligations. R. W. Carr became ill and incapacitated for the performance of his official duties on June 27, 1959, and hence he could not have been consulted thereafter in relation to the action *355 taken by the council at its regular meeting on June 30. It may have been of some significance to the trial court that Attorney Robert Evans Stealey, a witness in behalf of the respondents, testified in relation to Councilman Carr: "* * * in my opinion, from observations that I have had from conferences with Mr. Carr, I thought that he had slipped mentally and physically during the year 1959. That observation may not have been apparent to other people." Assuming that Councilman Carr did give to the respondents assurances such as they assert during April, May and June, the undisputed facts would tend to lend credence to the observation expressed by Attorney Stealey, because such assurances would have been so vastly at variance with the actual facts. It is regrettable that Mr. Carr became so totally incapacitated mentally and physically that he was unable to appear as a witness at the hearing in order to give his version of such assurances and the basis thereof. The fact remains that the clerical force in Mr. Carr's department were employees of the city, subject to the will, direction and control of the mayor and council. Whatever information Councilman Carr may have had as a basis for such assurances he may have given to the respondents, such information necessarily came from such clerical force and the records kept by them. From the testimony of J. Phil Cramer, a public accountant, and from a stipulation made by counsel it appears that the record of receipts was kept on a day to day basis and that on any given day the respondents readily could have determined the total receipts to that date. The trial court found that such records were excellent and adequate to keep the respondents "well informed therefrom of the status of the general fund of the City throughout the year." Yet the respondents state frankly that they continued to expend money and to incur obligations as the fiscal year drew to a close without consulting this original, reliable and official source of accurate information. It was, nevertheless, obvious to the respondents from the monthly reports received tardily by them and from information given to them by Carr that, during April, May and June, actual receipts were falling critically short of estimated receipts. This was particularly true in relation to item "T" of the 1958-59 levy estimate, embracing "Miscellaneous Receipts."
In a further effort to justify their acts, the respondents assert that they relied upon the monthly financial statements, and that the statement for the month of June was not received until early August. Such being true, until the monthly report for May was received by the respondents during the latter part of June, the last monthly statement they had was for the period ending April 30. That report, for the month of April, disclosed an overdraft in the general fund amounting to $34,142.81. Certainly it did not furnish a basis for optimism and favorable assurance in relation to the status of the general fund as the end of the fiscal year approached so closely.
The law requires of public officials, such as the respondents, that they "exercise ordinary diligence to keep informed of the condition of funds subject to their disposal." Ball v. Toler, 109 W.Va. 61, syl., 153 S.E. 238. In the body of the opinion (109 W.Va. 63-64, 153 S.E. 239), the Court stated:
"The obligation of a public official to `faithfully perform the duties' of his office is not satisfied with a perfunctory performance. Nail v. Browning, 73 Fla. 316, 74 So. 315. He must not rely on indirect information when direct information is at hand. He will not be permitted to close his eyes to the condition of funds entrusted to him. He cannot avoid statutory restrictions on the ground of ignorance which results from his own inattention. It is his plain duty to be informed. That duty is a primary one. It requires the exercise of the diligence of an ordinarily prudent man. Hamrick v. McCutcheon et al., 101 W.Va. 485, 133 S.E. 127.

*356 * * * Even if the desirability and good faith of the purchase, which are denied, be admitted, the defendants were patently negligent in making, at that time of the fiscal year, an expenditure of such comparative magnitude, not contemplated in the levy, without definitely ascertaining whether the balance in the fund warranted the expenditure." (Italics supplied.)
Chapter 11, Article 8, Section 13, Code, 1931, originally was, in part, as follows: "It shall be unlawful for any county court, board of education, or council of a municipal corporation, * * * to expend any money or to incur any obligation or indebtedness which such fiscal body is not expressly authorized by law to expend or incur. Nor shall any such fiscal body make any contract, express or implied the performance of which, in whole or in part, would involve the expenditure of money in excess of funds legally at the disposal of such fiscal body, nor issue or authorize to be issued any certificate, order or other evidence of indebtedness which cannot be paid out of the levy for the current fiscal year or out of the fund against which it is issued."
The identical language was included in Code, 1923, Chapter 28A, Section 12. Substantially the same provisions have been a part of the statutory law of this State since 1908. State ex rel. Sprague v. County Court of Greenbrier County, 93 W.Va. 481, 488, 117 S.E. 135, 138.
Code, 1931, 11-8-13, was amended by Acts of the Legislature, Regular Session, 1933, Chapter 38; Acts of the Legislature, Second Extraordinary Session, 1933, Chapter 67; and by Acts of the Legislature, Regular Session, 1958, Chapter 15. As a result thereof, Code, 1931, 11-8-26, as amended, is as follows:
"Except as provided in the next preceding section a local fiscal body shall not expend money or incur obligations:
"(1) In an unauthorized manner;
"(2) For an unauthorized purpose;
"(3) In excess of the amount allocated to the fund in the levy order;
"(4) In excess of the funds available for current expenses."
The historical development of the statute quoted immediately above is traced in Meador v. County Court of McDowell County, 141 W.Va. 96, 87 S.E.2d 275; State ex rel. Boone Nat. Bank of Madison v. Manns, 126 W.Va. 643, 29 S.E.2d 621; and Andrews v. County Court of Kanawha County, 114 W.Va. 423, 172 S.E. 611.
Throughout its history the basic policy of the statute has been that a local fiscal body shall make no contract and incur no obligation "which would involve the expenditure of future levies", Swiger v. Board of Education, 107 W.Va. 173, 147 S.E. 708, 710, or which would involve "payment by future tax levies." Shonk Land Co. et al. v. Joachim et al., 96 W.Va. 708, pt. 5 syl., 123 S.E. 444. See also Article X, Section 8, Constitution of West Virginia, placing restrictions on fiscal bodies in the creation of indebtedness. In the Shonk case (96 W.Va. at page 721, 123 S.E. at page 449) the Court stated: "The law must be administered as it is written. The contracts under consideration were illegal and void, made expressly so by the statute, and cannot be enforced. The Legislature has deemed it wise to so declare in order that levies may not be anticipated; floating indebtedness passed on to future years bringing about former chaotic conditions in fiscal affairs, and to insure that the fiscal bodies named in the statute shall have at their disposal funds to meet their contracts and obligations in the fiscal year when the obligations were incurred, or the contracts made. Necessity and inconvenience will not justify the bending or breaking of this law." See also State ex rel. Huddleston v. County Court of McDowell County, 98 W.Va. 706, 128 S.E. 925; Hamrick et al. v. McCutcheon et al., 101 W.Va. 485, 133 S.E. 127; Kanawha Mfg. Co. v. City of Charleston, 105 W.Va. 98, 141 S.E. 520: Swiger v. Board, 107 W.Va. 173, 147 *357 S.E. 708; Woodyard Publications, Inc. v. Lambert et al., 112 W.Va. 22, 163 S.E. 858; State ex rel. County Court of Tyler County v. Shipman, 112 W.Va. 529, 165 S.E. 801; Ireland v. Board, 115 W.Va. 614, 177 S.E. 452; Humphries v. Black Betsy Consolidated Coal Co., 115 W.Va. 768, 178 S.E. 273. After the 1933 amendments, the pertinent statute in its amended form continued to be construed in effect substantially as formerly. Andrews v. County Court of Kanawha County, 114 W.Va. 423, 172 S.E. 611; Love v. New River & Pocahontas Consolidated Coal Co., 119 W.Va. 222, 193 S.E. 59; Wysong v. Walden, 120 W.Va. 122, 196 S.E. 573; Sessler v. Partlow, 126 W.Va. 232, 237, 27 S.E.2d 829, 832; State ex rel. Boone Nat. Bank of Madison v. Manns, 126 W.Va. 643, 29 S.E.2d 621; Baldwin v. City of Martinsburg, 133 W.Va. 513, 56 S.E.2d 886; Meador v. County Court, 141 W.Va. 96, 87 S.E.2d 725. In the case of Wysong v. Walden, 120 W.Va. 122, 196 S.E. 573, 578, a proceeding to remove from office members of a county board of education, the Court, in summarizing the applicable principles of law, stated:
"Specification No. 6 is to the effect that the respondents, in their capacity as members of the board of education willfully and negligently expended money, incurred obligations and indebtedness on behalf of the board, which it was unauthorized to expend and incur; that they made contracts, the performance of which, in whole or in part, involved and required the expenditure of money in excess of funds legally at the disposal of the board; and that they authorized and caused to be issued certificates, orders and other evidence of indebtedness which could not be paid out of the levy for the current fiscal year, or out of the funds against which said orders were issued. This is the gravamen of this specification. It involves the violation of subdivision 4, section 26 of chapter 67, Acts 2d. Ex.Sess.1933, which chapter supersedes article 8 of chapter 11, Code, 1931. The underlying purpose of the statute [subdivision 4, section 26, in the instant case] is to prevent the incurring of obligations which can be met only out of funds to be realized from levies of a subsequent year.' Ireland v. Board of Education, 115 W. Va. 614, 617, 177 S.E. 452. The mere inadvertent violation of a fiscal statute as to the expenditures of public moneys is not ground for removal of the officers composing the fiscal body. The forfeiture of a fiscal office for the unlawful expenditure of public moneys will not be declared unless there be a negligent or wilful violation. Hamrick v. McCutcheon, 101 W.Va. 485, 133 S.E. 127. Where, however, the violation of the statute is either willful or negligent, courts should not hestitate to enforce the statute by the removal of the officers who have violated it. Ball v. Toler, 109 W.Va. 61, 153 S.E. 238."
The statutory inhibitions upon fiscal bodies in the expenditure of public funds are clear both in letter and in spirit. The trial court, sitting in lieu of a jury, heard the testimony orally at the bar of the court. The findings of fact made by the trial court are, therefore, entitled to the same weight as the verdict of a jury. Daugherty v. Ellis, 142 W.Va. 340, 97 S.E. 2d 33. We can not say that such findings are unwarranted, particularly to the extent that the trial court found and held that the defendants negligently violated the provisions of Code, 1931, Chapter 11, Article 8, as amended.
We have considered carefully other assignments of error urged in behalf of the respondents which have not been dealt with specifically in this opinion, but we perceive in relation thereto no error deemed prejudicial to the rights of the respondents.
For the reasons stated herein the judgment of the Circuit Court of Wood County is affirmed.
Affirmed.

*358 On Petition for Rehearing
While the prayer of the petition for a rehearing has been denied in the foregoing case of Edwards et al. v. Hylbert, etc., et al., in connection therewith attention has been called to an inadvertence in the opinion.
On page 351 of the opinion, the Court stated that the council resolutions relative to the purchase of the two Oldsmobiles and the Chrysler were prepared by the "acting" city solicitor, and that the "acting" city solicitor assisted in the preparation of the resolution relative to the four Ford automobiles, but, as a matter of fact, it was the "city solicitor" who did so in each instance.
This note is appended to the opinion for purposes of clarification in relation to such inadvertence.
BROWNING, President (concurring).
I concur. By giving to the findings of the trial judge, who heard the voluminous testimony in this case in lieu of a jury, the weight to which it is entitled, I agree with some reluctance to the Court's conclusion that the evidence warranted the finding that the respondents negligently violated the provisions of Code, 11-8-26, as amended, but I disagree with the affirmance of the trial court's holding that there was a wilful violation of the provisions of this section by any of the respondents under any of the specifications contained in the petition to remove them from office. The words "wilful" and "negligent" are far from being synonymous in either their legal or lay connotations. Furthermore, the possible subsequent legal effect of a finding of wilful violation of this statute could be important to these respondents and, since I do not believe the evidence warrants such a finding, I register my protest against the apparent conclusion in the opinion, which I assume will be carried into the mandate of this Court, that the trial court's final order was affirmed in toto.