RICHARD L. EVANS, BILLY J. WELLMAN, OMERY LAYNE,
JOHNNY MACK MERRITT, CLIFFORD MILLS, PATRICIA
SOWDER, CLYDE RICKMAN, JAMES A. REYNOLDS, STELLA
EVANS, AND WILMA LAYNE

*v.*

PAUL E. HUTCHINSON, FRED H. BROWN,
*and* FRANKLIN STEPHENSON

(No. 13487)

Decided January 21, 1975.

*Maurice G. Taylor, Jr., William K. Napier and Philip A. Baer* for appellants.

*Greene, Ketchum & Baker, George A. Mills, III* for appellees.

HADEN, CHIEF JUSTICE:

This opinion states this Court's reasons for its order of October 22, 1974, reversing in part and affirming in part the final order of the Circuit Court of Wayne County which had removed the appellants from office as members of the Board of Education of Wayne County after a trial in which that court had found the appellants guilty of the civil charges of official misconduct, neglect of official duties, and malfeasance in office. The order of this Court affirmed the removal of the appellants Hutchinson and Stephenson on the findings of malfeasance in office and reversed the trial court's legal and factual determination that appellants Hutchinson and Brown were guilty of official misconduct and neglect of duties. Brown was thereby reinstated to his former position as board member, while Hutchinson and Stephenson were held to have forfeited their offices pursuant to the prior order of the court below.

The appellees are citizens and taxpayers of Wayne County who petitioned the court there for removal of the entire membership of the Board on various charges involving misconduct, neglect of official duties and malfeasance. At trial, proof centered upon two matters: first, an uncontroverted showing that the Board had spent itself into deficit for the consecutive fiscal years of 1970-71 and 1971-72; and second, that certain Board members and a member-elect had used the county

school bus garage, its equipment and a small amount of consumable supplies owned by the Board for the painting of the members' privately owned motor vehicles.

In a comprehensive and able opinion prepared by the Honorable C. W. Ferguson, III, Judge, the circuit court set forth findings of fact and conclusions of law supporting its final order. Based upon the evidence, the trial court did not find Board members Lawrence Morrison and Frank Canterbury guilty of wrongdoing warranting removal from office. In Lawrence Morrison's case, the court found that the deficit for the fiscal year 1970-71 occurred by reason of procedures effectuated before he assumed office, and that as to the deficit for fiscal year 1971-72, Morrison was not responsible because he had on several occasions objected to the Board's fiscal practices and lack of controls, had voted against the rehiring of the encumbent superintendent and had objected to the adoption of the proposed budget for fiscal 1971-72. As to the charge of malfeasance, no evidence was adduced to demonstrate that Morrison had participated in or had knowledge of the painting incidents at the county school bus garage. Frank Canterbury and Franklin Stephenson, having first taken office on January 1, 1973, were held not chargeable for neglect of duty in regard to the occurrence of the deficits in prior fiscal years, and upon their motion, such charges against them were dismissed by the court prior to trial.

Although some evidence was introduced at trial by the petitioners' witness Glen Curnutte that he would receive a job with the Board of Education in return for painting the privately owned automobiles at the school bus garage, and that Canterbury had participated in the "job offer" and thereby must have had knowledge of the activities involved in the malfeasance charge, the court found that this evidence, standing alone, did not rise to the level of proof sufficient to warrant Canterbury's removal on the charge of malfeasance.

On the other hand, the uncontroverted evidence demonstrated that Hutchinson, an encumbent Board mem-

ber, had had his own personal automobile painted by Curnutte at the Board garage and had several times promised or implied to Curnutte that he would receive a job with the Board of Education. Additional evidence showed that Curnutte had also painted Hutchinson's aunt's automobile at Hutchinson's request at the school garage. In Stephenson's case, the evidence showed that Curnutte repaired and painted Stephenson's truck, beginning while Stephenson was a member-elect, and concluding just after the 1st of January 1973, when Stephenson assumed office. Both Hutchinson and Stephenson introduced evidence that they had either furnished or paid for the paint used on their motor vehicles and had, as well, furnished most of the incidental supplies required for the painting projects.

At trial and here, on this appeal, appellants defend against this charge of malfeasance on three bases. First, they say that the use of school board facilities was in fact a well-accepted custom and practice of long duration done to foster and promote good public relations for the School Board with the community and other units of government. As examples of "similar" use of school facilities, they pointed to the fact that state policemen attached to the Department of Public Safety had regularly used the school bus garage on a gratuitous basis for the purpose of repairing their assigned State vehicles and privately owned vehicles and that other school facilities such as cafeterias and auditoriums had been used for dinners and meetings by the general public and by clubs and organizations. The trial court in its findings did not express approval of the use of the school bus garage by the Department of Public Safety police officers and expressly rejected, as dissimilar, the use of school board facilities for meetings and dinners by the general public, clubs and organizations from those activities charged to be malfeasant conduct in this case.

A board of education is a corporation created by statute with functions of a public nature expressly given, and no other; as such, it "can exercise only such power as is expressly conferred or fairly arises by necessary

implication, and only in the mode prescribed or authorized by the statute." *Dooley v. Board of Education*, 80 W. Va. 648, 93 S.E. 766 (1917); *Honaker v. Board of Education*, 42 W. Va. 170, 24 S.E. 544 (1896); *Shinn v. Board of Education*, 39 W. Va. 497, 20 S.E. 604 (1894). See also, *Herald v. Board of Education*, 65 W. Va. 765, 65 S.E. 102 (1909); *Pennsylvania Lightning Rod Co. v. Board of Education*, 20 W. Va. 360 (1882).

The permissible extra-educational uses of school board facilities are clearly delineated in *Code* 1931, 18-5-19, as amended, permitting, *inter alia*, use ". . . to promote and facilitate frequent meetings and associations of the people for discussion, study, recreation and other community activities, and (to) secure, assemble and house material for use in the study of farm, home and community problems. . . ." The statute speaks comprehensively on the subject of extra-educational use of school facilities and hence operates to invoke the maxim of *inclusio unius est exclusio alterius*. *Cf.*, *Hunt v. Board of Education of County of Kanawha*, 321 F. Supp. 1263 (N.D. W. Va. 1971).

The obvious spirit of the statute permitting certain extra-educational uses of school facilities is to promote activities of a public rather than a private nature. 50 Op. Att'y Gen. 205 (1963). That the use in question was of a private rather than public nature cannot be seriously denied. The trial court therefore quite properly rejected this theory of defense.

Secondly, both appellants defended on the basis that such conduct, if wrong, was not official misconduct but rather, conduct done by them as individuals in their private capacity and not acting as Board members. The trial court rejected that theory of defense.

The official misconduct necessary to warrant removal from public office need not arise from or involve the precise duties enjoined upon the office held; it is, rather, any unlawful behavior "in relation to" the duties of the office. *Kesling v. Moore*, 102 W. Va. 251, 135 S.E. 246 (1926). The test, therefore, is relevancy. It cannot be

asserted seriously on these facts that the assailed conduct arose other than for the reason that these officials (appellants) were exercising what they believed to be the perquisites of their office. Conversely, no one connected with this case attempted to justify or excuse the conduct by demonstrating that the painting activity in any manner was coincident to a school-related activity. Under these circumstances, therefore, the trial court properly rejected such defense.

Thirdly, both parties defended on the basis that, if their conduct constituted a technical malfeasance in office, it was of such a trivial or inconsequential nature as to be characterized in law as *de minimus* and as such not sufficient to warrant their removal from office on the ground of malfeasance. The trial court also rejected this mode of defense.

Although the *de minimus* principle is generally recognized as a proper defense in a removal proceeding, *Jordan v. McCourt,* 135 W. Va. 79, 62 S.E.2d 555 (1950); 67 C.J.S., Officers, § 60 (1950), the defense is essentially one of fact, the resolution of which by a fact finder would be entitled to great weight by this Court. In *Daugherty v. Ellis,* 142 W. Va. 340, 97 S.E.2d 33 (1956), it was said: "The finding of a trial court upon facts submitted to it in lieu of a jury will be given the same weight as the verdict of a jury and will not be disturbed by an appellate court unless the evidence plainly and decidedly preponderates against such finding." *Syllabus* point 6, id. To the same effect, see *Edwards v. Hylbert,* 146 W. Va. 1, 118 S.E.2d 347 (1960); *Board of Education of Hancock County v. Hartford Fire Insurance Company, et al,* 124 W. Va. 163, 19 S.E.2d 448 (1942). See also, *Watkins v. Norfolk & Western Railway Company,* 125 W. Va. 159, 23 S.E.2d 621 (1942); *Sutton v. Sutton,* 128 W. Va. 290, 36 S.E.2d 608 (1945). In view of the conflicting evidence in this case relating to the use of the school board materials and equipment in the preparation and painting of the vehicles, the uncontroverted evidence concerning the use of the garage facility—necessarily involving the

use and consumption of incidental utilities—and the conflicting evidence relating to the promise of a job to Curnutte, this Court is of opinion that the trial court did not reject improperly, the *de minimus* contention. It chose to give greater weight to the totality of the activities knowingly conducted on school property for private gain.

Additionally, Stephenson, the Board member-elect prior to January 1, 1973, relied upon this Court's holding in the case of *Smith v. Godby*, 154 W. Va. 190, 174 S.E.2d 165 (1970), which acknowledged, *inter alia*, a general proposition also found in 63 Am. Jur. 2d *Public Officers* § 199 (1972):

> "According to many authorities, a public officer may not be removed or impeached for acts committed before his entry into office, . . . ."

The trial court did not choose to apply that general statement of the law to the evidence of this case. The Constitution of West Virginia (Art. IV, § 6) authorizes removal from office for official misconduct, etc., without reference to the current term of office. Similarly, *Code* 1931, 6-6-5, as amended, authorizes removal for misconduct, etc., without reference to any particular term. Nevertheless by clear implication such misconduct must relate to the office held.

This is not to say, however, that election or reelection to a term of office immaculates the officeholder. Where, as here, the alleged misconduct arises out of the exercise of anticipated authority by the official elect, relative to and under circumstances reasonably invoking response from others to the privilege or authority asserted, the so-called "general rule" must necessarily be qualified to permit consideration of such circumstances as constituting possible grounds for removal. Such transgressions, although occurring prior to the assumption of office, relate directly to the anticipated term. Further, as these activities occurred post election, they cannot, be construed, by any stretch of legal fiction, as condoned by the electorate. Under these circumstances, therefore, the trial court quite properly considered Ste-

phenson's misconduct occurring just prior to his taking office as relevant to the charge of malfeasance.

Stephenson also complains here that the dismissal of the charges against him by the court prior to the trial, by reason of his having not assumed office until January 1, 1973, also operated to his benefit on the malfeasance charge. Accordingly, when the court found him guilty of malfeasance for acts occurring beginning prior to his assuming office, he was surprised, thus unable to defend, and thereby deprived of notice and due process of law. He asserts, by implication, that the court's finding of his guilt on this ground is void and should be so declared by this Court.

The right to notice of the charges levied, as well as a reasonable opportunity to defend against such charges, is not only a fundamental requirement of due process, it is pointedly required by statute in these cases. With reference to a predecessor of *Code* 1931, 6-6-7, as amended, this Court has said:

> "The requirement of said statute [Code 1913, chapter 7, section 7] that the charges against such public officers 'shall be reduced to writing and entered of record by the court,' is mandatory, and must be literally complied with as a prerequisite to valid process against the defendant to answer the same." Part *Syllabus* point 2, *Dawson v. Phillips,* 78 W. Va. 14, 88 S.E. 456 (1916).

See also, 15 M.J., *Public Officers,* § 36 (1951).

That the same rule of notice applies to the charges retained for trial after the successful elimination of a portion of these charges upon motion by the accused officer is not questioned. In this case, however, we hold that the trial court's order of January 30, 1974, although inartfully drafted, sufficiently satisfied such requirement. The order sustained the motion "insofar and insofar only" as it related to the grounds and allegations prior to January 1, 1973 for the reason that the movants "were not in office and therefore would not be liable for

any shortage" which, obviously referred to fiscal matters only. The same order retained "all other charges contained in Motion No. 1", and thereby constituted the basis for Stephenson's participation in the trial. Independently of the fiscal responsibilities, therefore, Stephenson was not, by said order, relieved of said charge of malfeasance.

As to all of the foregoing, this Court is not distressed as to either the correctness of the court's legal rulings or the substantial weight of evidence supporting its findings of fact. Its conclusions exonerating two Board members on all charges and removing two other Board members on charges of malfeasant conduct are amply supported by the evidence of the case. The excuses offered by the respondents Hutchinson and Stephenson do not provide legal justification for reversal by this Court.

On the other hand, we are troubled by the trial court's finding that the appellants Hutchinson and Brown were guilty of official misconduct and neglect of official duty under *Code* 1931, 6-6-7, and in specific regard to the deficit operation of the Board of Education, proscribed by *Code* 1931, 11-8-26. These findings were predicated upon the court's legal conclusion that a deficit in excess of 3% of the county property tax levies devoted to school purposes occurred and that that constituted a removable offense within the meaning of the applicable statutes. We granted this appeal primarily to determine whether the trial court was correct in that legal determination. The resolution of this question is a matter of importance, specifically to the outcome of this case and generally, and more significantly, to the control policies employed to secure fiscal responsibility in the operation of school districts throughout the State of West Virginia.

In the calendar year of 1972, the State Tax Commissioner, acting in his capacity as ex officio Chief Inspector of Public Offices, assigned one of his employees, Victor Gibson, a tax examiner, to audit the expenditures of the Wayne County Board of Education for the fiscal year of 1970-71 which had closed and thereafter ordered a

second audit for fiscal year 1971-72 which ended on June 30, 1972. Parenthetically, the Tax Commissioner's office has been charged with the responsibility of conducting post audits of expenditures by county and municipal instrumentalities of government since 1908. *Code* 1931, 6-9-1, et seq.

In July of 1972, the preliminary results were available from the audit of expenditures made by the Wayne County Board of Education in the two named fiscal years. These unofficial results demonstrated that the Board of Education had operated at a deficit in both of the fiscal years in question. Because of the deficit situation, the Tax Commissioner requested that the appropriate Wayne County school officials come to Charleston for a meeting with him and the tax examiner who had conducted the field audit. In that discussion, the Wayne County school officials were advised that they were in a deficit position, that many corrections in the Board's accounting system would have to be made, and that an encumbrance system relating to purchases and other expenditures would have to be instituted.

In January of 1973, the Tax Commissioner certified the official results of the audits for the two fiscal years and there determined that the Board of Education incurred a net deficit in the amount of $105,926.08 for the fiscal year ending June 30, 1971, and also incurred a net deficit in the amount of $186,734.97 for the fiscal year ending June 30, 1972. In each instance, the Tax Commissioner concluded that the deficit did not exceed the 3% casual deficit permitted by *W. Va. Code*, Chapter 11, Article 8, Section 26, which provides, in part, as follows:

"... [A] local fiscal body shall not expend money or incur obligations:

. . .

"(3) In excess of the amount allocated to the fund in the levy order;

"(4) In excess of the funds available for current expenses.

> *"Notwithstanding the foregoing and any other provision of law to the contrary, a local fiscal body or its duly authorized officials shall not be penalized for a casual deficit which does not exceed its approved levy estimate by more than three per cent, provided such casual deficit be satisfied in the levy estimate for the succeeding fiscal year."* (Emphasis supplied.)

Levy estimate is defined by the Code as follows: " 'Levy estimate' means the summary statement of the total budgeted school requirements prepared and adopted by a county board of education in accordance with law, in justification of the amount levied upon taxable property within the county for the support of the local schools." *W. Va. Code,* Chapter 18, Article 9B, Section 2, as amended.

Section 12 of Chapter 11, Article 8, *Code* 1931, requires that each local board of education ascertain the condition of the fiscal affairs of the district and make a statement setting forth, *inter alia,* "(1) The amount due, and the amount that will become due and collectible during the current fiscal year except from the levy of taxes to be made for the year * * * (6) The amount of such total to be raised by the levy of taxes for the current fiscal year * * *." The following section, § 12a, prohibits the entry of any levy by a board of education until such levy is approved in writing by the Tax Commissioner, and requires that the statement so approved be entered by the board in its record of proceedings, together with the written approval. Section 18 requires that the Tax Commissioner prepare and furnish forms and instructions for making the statement required by said section 12a.

Based upon these sections of the West Virginia Code, the Tax Commissioner concluded that in fiscal year 1971, the Wayne County Board of Education was operating on a total budget of approximately $7.5 million and in fiscal year 1971-72 was operating on a total budget of approximately $8.3 million. These figures aggregated all the monies available to the local board of education, includ-

ing the local share of tax monies leviable through the tax limitation amendment, the 100% excess levy monies approved by the voters of Wayne County for a five-year period, the state aid foundation formula monies available from the State of West Virginia, federal aid monies, and miscellaneous sources of income. In the excess levy monies available for expenditure by the Board for the five-year period, 52% was allocable over the time period and annually to general current expenditures, as contrasted with 48% being earmarked funds for capital outlays for school improvement. In computing the total amount expended and in computing the annual deficit in the two fiscal years, the Tax Commissioner offset 52% of the excess levy monies available to the Board against the operating deficit and thereby ascertained the net deficit figures previously noted.

The Tax Commissioner's method of calculating the total expenditures of the Board of Education in the two fiscal years and in arriving at his conclusion of the deficit amounts was agreed to by the State Department of Education and the State Board of School Finance. Aaron Rapking, a deputy superintendent of schools in charge of the State Board of School Finance also testified that this same method was used by the State Department of Education and the State Board of School Finance in reaching its conclusions.

On the other hand, the Circuit Court of Wayne County, viewing the same basic fiscal findings, reached an opposite conclusion. It said in its opinion:

> "Included in this case are statements by several officials of this State, that in their opinion the deficits shown by Petitioners' Exhibits No. 1, and No. 2, were casual deficits which does not exceed the statutory limit of three per cent. When questioned on how they arrived at this conclusion it was demonstrated on page No. 11 of both exhibits called summary sheets, on the line of Net Balance, that they, the State officials, had made the decision to apply the funds of the Excess levy to the deficit under the General Current Expense

Fund to arrive at the net deficit. It was further testified to, that to determine the allowable three per cent deficit, or casual deficit, a figure of Total Revenue available under General Current Expense Fund was used. The first administrative determination was that since several items in the excess levy were items covered usually under General Current Expense, which was 52% of the excess levy, it should be used to offset the deficit in the General Current Expense account. Further, the second part of the administrative decision was that all funds, including State aid and Federal aid for special programs would make up the levy estimate.

"This Court cannot subscribe to either view or the procedures which were used in these audits above referred to. It is not for an administrative body to interpret a statute of this State, as this is solely the province of the Court. Further, I do not believe that this should be a standard accounting procedure throughout the State, when the Tax Commissioner of this State says this was a case of first instance to his department, to apply excess levy funds to a deficit of the General Fund, and an administrative decision was made to do so."

The quote from the trial court's opinion illustrates the basic problem of this case, that is, whether all funds available for expenditure by a county board of education are to be used in determining whether the proscribed deficit has occurred, or whether, as the trial court felt, only those funds available from county property tax share monies are to be computed in determining the amount of the deficit figure.

On this point, the trial court said that the Tax Commissioner, the State Department of Education and the Board of School Finance were wrong in their legal determination and that it was not within the province of an administrative body to make such determination in the first instance.

With this latter conclusion we respectfully disagree with the trial court. Staggering administrative burden would fall to the entire court system if administrative bodies operating as delegates of the Executive Department were forbidden to make interpretations of statutes which they are charged by law with administering. This Court has consistently recognized that the uniform construction of a statute by administrative officers charged with the duty of enforcing the same is entitled to great weight by the courts where the language of the statutes is ambiguous or of doubtful meaning.

In *State ex rel. Daily Gazette Company v. County Court*, 137 W. Va. 127, 70 S.E.2d 260 (1952), it was said:

> "This court has held that a construction given a statute by the officers charged with the duty of executing it ought not to be discarded without cogent reason. *Daniel v. Simms*, 49 W. Va. 554, 39 S.E. 690; *Brandon v. Board of Control*, 84 W. Va. 417, 420, 100 S.E. 215; *Insurance Co. v. Board*, 111 W. Va. 161, 169, 161 S.E. 427. 'Where a statute is of doubtful meaning the contemporaneous construction placed thereon by the officers of government charged with its execution is entitled to great weight, and will not be disregarded or overthrown unless it is clear that such construction is erroneous.' *Brandon v. Board of Control, supra.*" *Id.*, 132 of the West Virginia Reports.

Significantly, that case involved the use forms (financial statements) prepared by the State Tax Commissioner. Similarly, in *State v. Davis*, 62 W. Va. 500, 60 S.E. 584, 14 L.R.A., N.S., 1142 (1907), this Court held:

> "A contemporary exposition of a statute, uncertain in its meaning, recognized and acquiesced in, for a long period of time, by the officers charged with the duty of enforcing it, the courts, the Legislature and the people, will be adopted unless it is manifestly wrong." *Syllabus* point 4, *id.*

*See also, State v. Hix*, 141 W. Va. 385, 389, 90 S.E.2d 357 (1955); 1A M.J. *Administrative Law* § 8 (1967).

It would be an understatement to say that the statutes of this State committing to the State Tax Commissioner the general responsibility of supervision and regulation of the fiscal operations of all county and local units of government are complex statutes and subject to various interpretations, depending upon one's relative expertise in the field. In this particular area of government the office of State Tax Commissioner and that of the State Board of School Finance and the State Department of Education are charged with the direct responsibility of annual approval of budgets prepared by county boards of education at the direction of the State Tax Department. Additionally, the Tax Department is charged with the responsibility of auditing expenditures made under these budget documents after the fiscal years have concluded. Suffice it to say, the operating instructions delegated by the Legislature to certain fiscal officers in State and local government to insure sound fiscal management of public expenditures are intricate and involve several chapters of the *Code* and a host of implemental administrative interpretations. The Tax Commissioner is one of those officials who, of necessity, has coped with the general directives of the law by prescribing forms and instituting procedures designed to secure adherence to the law.

On the premise that levy estimate includes the total budgeted requirements of the board of education, the Tax Commissioner in the preparation of his forms made available to the counties for the preparation of an approved levy estimate and a general operating budget for the school system, has determined that the boards of education in the fifty-five several counties of this State shall be responsible and be held accountable for all of their expenditures derived from funds at the local, the State and the federal level rather than requiring the board of education to be accountable only for the expenditures of those funds which are traceable to the county's share of property tax levies. The same plan is also carried forward in the Tax Commissioner's post-audit procedures in Wayne County. For example, a meaningful

audit procedure would hold the Board of Education accountable for the expenditure of $7.5 million and $8.3 million, the total operating expenditures of that body for the two fiscal years, rather than the expenditure of $2.5 million which represents only the total local tax share raised in Wayne County and merely a portion of the Board's total expenditures. In his determination that the Wayne County Board of Education is to be held responsible for the expenditure of the total amount rather than the local tax share amount, the Tax Commissioner is proceeding in the spirit of the fiscal statutes protecting public funds.

The trial court also disagreed with and held invalid the Tax Commissioner's determination that excess levy monies approved by the people for use by the Board of Education in the operation of its schools may be used to reduce or offset the operating deficits of the board during the questioned fiscal years. The trial court relied heavily upon this Court's decision in *Jarrell v. Board of Education of Raleigh County*, 131 W. Va. 702, 50 S.E.2d 442 (1948). There this Court jealously protected the right of the voters of the county to determine how excess levy monies would be spent within the school system, applying the rule in *Haws v. The County Court of Wayne County*, 86 W. Va. 650, 104 S.E. 119 (1920), that " 'The voters of a county ... may place upon the expenditure of such funds any limitations or restrictions not forbidden by the fundamental law, and those charged with the expenditure of such funds will be enjoined from diverting the same to any other purpose than that to which they are directed to be applied by the terms of the grant.' " *Id.*, page 709 of the W. Va. Reports. We remain in complete agreement with the principles expressed in that opinion of this Court.

On the other hand, we believe that the admonitions contained in that opinion are inapposite to the facts of this case for the reason that this particular excess levy call authorized that 52% of the monies to be derived from the excess levy was to be expended for county school general operation purposes. Accordingly, when

the Tax Commissioner chose to offset the operating deficit of the Board of Education of Wayne County with a portion of the excess levy funds available for a purpose authorized by the people of Wayne County in approving the levy, that determination was consistent both with the law and with the expressed will of the voters of Wayne County.

For the foregoing reasons we recognize and reaffirm the principle that an administrative officer has the authority to construe and apply a statute of doubtful meaning which he is charged to administer so long as such application of the law does not contravene the plain provisions of the statute. Secondly, we hold that the trial court also was in error in concluding as a matter of law that the calculation of an allowable 3% or casual deficit within the meaning of *Code* 1931, Chapter 11, Article 8, Section 26, as amended, is to be made solely against the amount of monies available to a school district through levy upon property located in that county. We accordingly hold that the deficits in the fiscal years of 1970-71 and 1971-72 in the amount of $105,926.08 and $186,734.97, respectively, were casual deficits permissible by statute. Further the officers ultimately responsible for those deficits, the members of the Board of Education of Wayne County were entitled to the benefits of the "hold harmless" provision of *Code* 1931, 11-8-26, which provides *inter alia* that "a local fiscal body * * * shall not be penalized for a casual deficit which does not exceed its approved levy by more that three per cent, provided such casual deficit be satisfied in the levy estimate for the succeeding fiscal year."

Having decided that the respondents Brown and Hutchinson were not in violation of *Code* 1931, Chapter 11, Article 8, Section 26, we are nevertheless faced with the additional and more general question of whether Board members, Hutchinson and Brown, were, as the trial court found, also in violation of *Code* 1931, Chapter 6, Article 6, Section 7, the more general statutory provision providing that an official may be removed from

office for, among other things, official misconduct or neglect of official duty.

In this respect, notable failings within the financial management and accounting system of the Wayne County Board of Education were recognized and given comment by the trial court in its decision. It is readily apparent, however, that the trial court's decision was predicated primarily on the findings that the deficits in question were not casual in nature. Conversely it is equally apparent that the effect of such fiscal failings, independently of the deficit question, were not found to constitute removable conduct.

In a recent appeal in which this Court ordered the reinstatement of an assessor removed from office, this Court held:

> "The remedy for the removal from office of a public officer is a drastic remedy and the statutory provision prescribing the grounds for removal is given strict construction." *Syllabus* point 2, *Smith v. Godby, supra.*

That case also recognized that, under *Code* 1931, 6-6-7, "to remove a person from office the charge against him must be established by satisfactory proof." Further, this Court elaborated by approving the proposition that "the evidence to sustain a removal in a proceeding to remove a public officer must be clear and convincing." *Id.* at page 199 of the West Virginia Reports.

Moreover, in *Hamrick v. McCutcheon*, 101 W. Va. 485, 133 S.E. 127 (1926), it was said:

> "... [T]he defendants must be judged by the standard of the reasonably careful man, and not by the standard of extraordinary prudence. Mechem, Public Affairs, Sec. 301. To exact a higher degree of care would deter prudent men from accepting office. (citation omitted.) *Id.*, p. 491."

We therefore hold that the "satisfactory proof" required by statute, in this context, must be clear and convincing. Accordingly, the trial court's ruling which removed

Hutchinson and Brown because of their failure to correct fiscal procedures which brought the Board to a deficit financial position must be reviewed from this perspective.

The evidence in this case amply supports the lower court's characterization of the Board's accounting system as "a mess." The court also was justified in its criticism of the appellants for retaining in office, after receiving notice of the fiscal problems, the former superintendent of schools who was responsible for the abysmal bookkeeping. But a realistic appraisal of the evidence reveals no more than the fact that the slipshod accounting practices kept the Board's membership in the dark as to the exact state of its current financial position. Other than the excusable, but unlaudable, deficit occurrences, the Board was not conducting business unlawfully.

The terms "official misconduct" and "neglect of official duty" apparently are not susceptible of either simple definition or easy application. The general statements most often resorted to by this Court in removal proceeding appeals was framed by Judge Miller in *Kesling v. Moore*, 102 W. Va. 251, 135 S.E. 246 (1926):

> " 'By official misconduct is meant any unlawful behavior in relation to the duties of his office, wilful in its character, by any officer intrusted in any manner with the administration of justice or the execution of the laws.' 23 Am. & Eng. Enc. Law, (2nd ed.), 442. 'Any unlawful behavior by a public officer in relation to the duties of his office, wilful in character.' Black's Law Dictionary, (2nd ed.), 849. 'Misconduct in office means any unlawful misbehavior in regard to the duties of an office, wilful in its character.' 3 Words & Phrases, (2nd Ser.), 405, citing *State v. Blair*, 71 Ohio St. 410. See also, 40 C. J. 1221, and cases cited. 'The official neglect to do an act which ought to have been done, will constitute the offense, although there was no corrupt or malicious motive.' Mechem on Public Offices and Officers, § 458." *Id.* at page 257, West Virginia Reports.

From the above, mere proof of either a negligent omission, *i.e.*, failure to act or a negligent act which does not result in unlawful consequences, is not proof of a removable offense. In this case, negligence in fiscal affairs is apparent. But, when the operating deficits are held to be casual and thus excusable in law, the charge of unlawful conduct against appellants fails. The cases which the trial court relied upon to support its contrary ruling all involved, in one aspect or another, wilful, unlawful conduct on the part of the charged officials, and are, therefore, inapposite. *See, Edwards v. Hylbert*, 146 W. Va. 1, 118 S.E.2d 347 (1960); *Wysong v. Walden*, 120 W. Va. 122, 196 S.E. 573, 52 S.E.2d 392 (1938); *Ball v. Toler*, 109 W. Va. 61, 153 S.E. 238 (1930). Accordingly, the evidence of general negligent conduct or failure to act when action is normally required, without consequences declared unlawful by statute or case law, will not sustain the removal charges against the appellants.

As we likewise held in *Smith v. Godby, supra:*

"When the finding of a trial court in a case tried by it in lieu of a jury is against the preponderance of the evidence, is not supported by the evidence, or is plainly wrong, such finding will be reversed and set aside by this Court upon appellate review." *Syllabus* point 4.

Since, for the reasons stated, this Court is of the opinion that the finding of official misconduct and neglect of duties by Hutchinson and Brown were not supported by the evidence, the trial court's judgment was reversed by our previous order. Appellant Brown was thereby relieved of all charges.

*Affirmed in part;*
*reversed in part.*

Sprouse, Justice, *dissenting:*

I concur with the majority opinion except that part relating to the interpretation of West Virginia Code of 1931, Chapter 11, Article 8, Section 26, as amended. I respectfully dissent from the majority's view that

this section permits local fiscal bodies to overspend an amount equal to three per cent of their total budget. Officials are permitted such annual over-expenditure or "casual deficit" without penalty if it does not exceed three per cent of "its approved levy estimate." The Wayne County School Board's expenditures were more than three percent over their approved levy estimate, but less than three percent over their entire budget. That part of Code, 11-8-26(4) protecting officials from penalties for such expenditure, provides:

> "(4) In excess of the funds available for current expenses.
>
> *"Notwithstanding the foregoing and any other provision of law to the contrary, a local fiscal body or its duly authorized officials shall not be penalized for a casual deficit which does not exceed its approved levy estimate by more than three per cent,* provided such casual deficit be satisfied in the levy estimate for the succeeding fiscal year." (Emphasis supplied.)

To arrive at its holding, the majority interpreted "approved levy estimate" to mean "total budgeted requirements" of the board of education. This interpretation is unwarranted because the statute is unambiguous. "Levy estimate" has a clear meaning, frequently applied in this State, but even if there was doubt as to its general meaning, the term is precisely defined as it relates to school budgets. In Code, 1931, 18-9B-2, as amended, it is defined as follows:

> " 'Levy estimate' means the summary statement of the total budgeted school requirements prepared and adopted by a county board of education in accordance with law, in justification of the amount levied upon taxable property within the county for the support of the local schools."

Unambiguous statutes are to be applied, not construed. *Canyon Public Service District v. Tasa Coal Company,* ___ W. Va. ___, 195 S.E.2d 647; *State ex rel. Dolin v. City of Huntington,* 154 W. Wa. 460, 176 S.E.2d 683;

*Farmers & Merchants Bank of Keyser v. Haden,* 154 W. Va. 292, 175 S.E.2d 167.

Funds received by a school board from a levy are only part of its total budgeted funds. The Legislature by the language in Code, 11-8-26(4) manifested its intent that an official should be penalized only for a "casual" deficit in relation to this amount. The legislative intent being clear, its purpose in defining a "casual deficit" in relation to this smaller increment of funds rather than to the total amount available to a fiscal body is unimportant.

I certainly agree that a prolonged and generally accepted interpretation of an administrative law statute by the officials charged with enforcing it is entitled to great weight, when the meaning of the statute is in doubt and before the courts for interpretation. There is no doubt, however, in the meaning of Code, 11-8-26. The Tax Commissioner was manifestly wrong in his interpretation of the statute. Moreover, his interpretations in these instances were not so antique or widespread. I fear the majority elevates the dignity of administrative holdings to a plane not contemplated by the cited case law. Those holdings are entitled to judicial respect, but to automatically accept them is to bow to purely mechanical expertise. The courts of this State should not so easily abdicate their constitutional assignments.