297 S.E.2d 836

**R.S. BURRUSS, d/b/a R.S. Burruss Lumber Co., et al.**

**v.**

**David C. HARDESTY, Jr., Tax Commissioner, etc.**

**No. 15498.**

Supreme Court of Appeals of West Virginia.

Nov. 18, 1982.

Thomas N. Chambers, Thomas G. Freeman, II, Jackson, Kelly, Holt & O'Farrell, Charleston, for appellees.

Robert S. Digges, Jr., Asst. Atty. Gen., Charleston, for appellant.

McGRAW, Justice:

The State Tax Commissioner appeals from a judgment of the Circuit Court of Kanawha County which modified tax assessments levied against four companies [hereinafter referred to as taxpayers][1] which produce timber and manufacture lumber. The central issue raised by these cases is when does production of timber end for purposes of calculating the timber's value under the business and occupation "privilege tax" levied by W.Va.Code § 11–13–2a (1974 Replacement Vol.).

In 1976, the Commissioner audited the taxpayers' business and occupation tax returns for the 1970–75 tax years. As a result of this audit, he issued deficiency tax notices against the taxpayers for a total amount of $121,386.51.[2] In addition, he levied penalties which totaled $28,148.75.[3] After an administrative hearing which included the taking of expert testimony by all parties, the Commissioner issued a decision February 13, 1978, waiving the penalties and reducing the deficiency assessments to a total of $117,138.37.[4] The taxpayers then appealed to the Circuit Court of Kanawha County, arguing that the Commissioner's method of calculating the value of timber produced after July 1, 1974, violated W.Va.Code § 11–13–2a. The lower court entered an order July 24, 1981, in which it ruled in the taxpayers' favor. The order directed the Commissioner to reduce the deficiency assessments against three of the firms to $33,334.92. Additionally, the order directed the Commissioner to award the fourth firm a refund of $4,352.92.[5] The lower court also ruled that the Commissioner had improperly denied the Georgia-Pacific Co., one of the taxpayers, industrial expansion credit authorized by W.Va.Code §§ 11–13C–2, –3 (1974 Replacement Vol.). In this appeal, the Commissioner seeks to have the $117,138.37 assessment and his ruling regarding industrial expansion credit reinstated.

I.

To resolve the issue, it is necessary to understand the taxpayers' participation in the logging system. The taxpayers cut timber and operate saw mills. They transport felled timber from the field to their saw mills.

The logging process begins by acquiring the right to cut and remove timber. The standing timber is called "stumpage." After a tree is cut down, a logger removes the limbs ("delimbing") and tree top ("topping") from the trunk. The remaining tree trunk is then taken to a central collection and loading area. At this time, the trunk is cut into smaller log sections. This process is referred to as "bucking." After bucking, the logs are loaded onto trucks and transported to a saw mill. After their arrival, bark is removed from the logs and they are either cut into lumber or used to manufacture wood chips.

The Commissioner argues that timber is produced for purposes of taxation when it arrives at the saw mill; therefore the timber should be valued at the mill. The taxpayers contend that production ends once the tree is severed from its root structure; therefore valuation should occur in the field. The effect of this disagreement is to either include or exclude the costs of delimbing, topping, bucking and transporting in the production value.

1. The appellees are R.S. Burruss, doing business as R.S. Burruss Lumber Co.; Kessel Lumber Supply, Inc.; Georgia-Pacific Corp.; and Hinchcliff Lumber Co.

2. The original deficiency assessments per company were $13,412.88 for Burruss; $3,674.74 for Kessel; $93,107.31 for Georgia-Pacific; and $31,191.58 for Hinchcliff.

3. Individual penalties were $2,716.23 for Burruss; $887.26 for Kessel; $17,459.05 for Georgia-Pacific; and $7,086.21 for Hinchcliff.

4. Final assessments imposed by the Commissioner were $8,502.70 for Burruss; $3,674.74 for Kessel; $83,869.35 for Georgia-Pacific; and $21,091.58 for Hinchcliff.

5. The lower court imposed deficiency assessments of $7,089.07 for Burruss; $6,051.61 for Georgia-Pacific; and $20,194.24 for Hinchcliff. The assessment against Kessel was vacated and a refund awarded.

The lower court ruled that production ends after a tree is felled and its limbs and top removed. The court noted that the long-standing practice of valuing production at 20 percent of the gross manufacturing proceeds supported the conclusion that production ends in the field rather than at the saw mill. The lower court found that timber is produced for commercial use once the tree is transformed into a tree trunk, and that subsequent activities such as bucking and transportation are not part of the production process.

## II

By law, producers of natural resources and manufacturers pay a "privilege tax" on the value of their products. W.Va.Code § 11–13–2a imposes such a levy on persons "in the business of severing, extracting, reducing to possession and producing for sale, profit or commercial use any natural resource products ...." W.Va.Code § 11–13–2b places a lower levy on persons "manufacturing, compounding, or preparing for sale, profit or commercial use" various types of goods and commodities.

Determining the value subject to the production levy is a straightforward procedure when the producer sells the natural resource on the open market. Difficulty arises, however, when the producer consumes the material in its own manufacturing process. The latter situation is present here because the taxpayers produce timber which they then use to manufacture lumber and other wood products. Prior to July 1, 1974, the production value of a natural resource was, by regulation, equated to 20 percent of the gross proceeds obtained for the product manufactured from the natural resource. Reg. BOT 6.50(b) (1964). Thus, prior to July 1, 1974, the taxpayers paid the production levy on 20 percent of whatever sum they obtained for their manufactured products.

6. Although the Commissioner's audit covered the 1970–75 tax years, this dispute concerns only the valuation of timber from July 1, 1974, to the end of the 1975 tax year. We note that the Legislature has amended the production value provision by defining timber production as the severing and delimbing of a tree. W.Va.

The controversy involved in this case developed after the Commissioner promulgated new regulations effective July 1, 1974.[6] The new regulations provide three alternative methods of calculating production value. The Commissioner may calculate the value by the price at which the resource would sell at the place of use, or by the average price such products were sold to the producer's customers. Reg. BOT 1.2A(2)(d) (1974). Additionally, the Commissioner may base the value on the costs incurred by the producer in producing the natural resource plus a markup. *Id.* In these cases, the Commissioner employed the "place of use" and "cost" methods of calculating production values.[7]

After July 1, 1974, the taxpayers continued to report the production value of timber as 20 percent of the manufacturing gross proceeds. However, using the new methods authorized by the regulations, the Commissioner's calculated values equaled approximately 50 percent of the gross proceeds. The tax difference created by application of the levy upon the 30 percent variation in valuation is at issue here.

## III

In order for the regulations employed by the Commissioner to be valid, they must determine the production value at the locale where production of the natural resource ends.

> The measure of the tax under the Business and Occupation Tax Act on the privilege of producing for sale, profit, or commercial use, any natural resource product, is the value of the article produced at the point where production ends, and not the value at the point where it is sold. Code, 11–13–1 et seq., 11–13–2a.

Code § 11–13–2a(7) (1982 Cum.Supp.) This statute does not affect this case since it was not enacted until 1982.

7. The Commissioner used the "place of use" alternative to calculate production value in the Georgia-Pacific and Hinchcliff cases.

Syllabus Point 8, *Soto v. Hope Natural Gas Co.*, 142 W.Va. 373, 95 S.E.2d 769 (1956).

The first alternative authorized by the regulations to determine production value is that of determining the price at which such resources would sell at the place of use. In this case, the product, timber, is consumed at the saw mill. Thus, the Commissioner sought to determine the production value of the timber at the mill. This is incorrect as a matter of law if production ends at any point other than the saw mill.

Similarly, the "cost" alternative may measure only those costs incurred up to the end of production.[8] The Commissioner included the costs of bucking and transportation in his determination of value under this method. In effect, he again measured the value at the saw mill since any reasonable producer would have included such costs in the price charged for products sold at the saw mill, the first alternative method of measurement.

Therefore, in order for the regulations as written and as applied to be valid, production must end at the saw mill. For the reasons given below, a majority of the Court believes that production ends after the tree is severed from its root structure and its limbs and top are removed. Thus, we find that the Commissioner erred in promulgating a "place of use" regulation because "place of use" and "place of production" are quite commonly not the same. Additionally, the Commissioner improperly included costs incurred after delimbing and topping in his determination of production value.

The starting point for our decision is the statutes governing imposition of taxes on production of natural resources and manufacturing. W.Va.Code § 11–13–2a, which establishes the levy rate for the production of natural resources, includes "severing, extracting, reducing to possession and producing for sale, profit or commercial use any natural resource products ...." The Commissioner argues that the phrase "pro-

ducing for sale, profit or commercial use" encompasses all activities until the product is transformed into a commercially viable product. We reject this argument because it ignores the fact that timber is commercially saleable in many forms. The right to cut timber may be sold. Once timber has been cut down, it may be sold. Once it has been severed, delimbed and topped, it may be sold.

The record is replete with expert testimony that preparation of timber for manufacturing begins with "bucking," the procedure in which trees are cut into logs of differing lengths in order to produce different products. For example, crossties, furniture veneer and plywood all require different lengths. Although other factors such as the quality of wood in a certain tree also determine the log length, it is clear that once bucking takes place, the available uses of the log have been greatly limited. Thus, bucking is the first conscious step in the preparation of the manufactured product.

Consistent with this expert testimony, both the present and the past Tax Department regulations covering determination of production value indicate that production does not include bucking and transportation, but ends once the tree has been severed, delimbed and topped. The 1964 regulation, in effect for 10 years, applied to persons producing timber "by cutting" it. Reg. BOT 6.50(a). The present regulation contains an instructional example which informs taxpayers that they must calculate the "value of the timber on the ground after severance." Reg. BOT 1.2a(G)(7). These factors, while not determinative, rebut the Commissioner's assertion that production begins upon severance and extends to delivery at the saw mill.

Prior to the 1974 rule changes, tax commissioners applied a 20 percent of gross proceeds formula to determine production value for at least 40 years. The record does not contain testimony indicating whether the 20 percent figure is an arbi-

---

**8.** The Commissioner used the "cost" alternative to calculate the production value in the Burruss and Kessel cases.

trary standard or whether it originated out of some demonstrable relationship to the cost of severing and trimming trees. The record, however, does contain unrebutted testimony that the costs of acquiring timber rights (stumpage), severing, delimbing and topping amount to 15–20 percent of the cost of manufactured lumber. This evidence indicates that the 20 percent formula has a demonstrable and tangible relationship to the cost of producing and manufacturing products subject to taxation. The interpretation given prior regulations may be considered as evidence of when production ends. *See generally Evans v. Hutchinson,* 158 W.Va. 359, 214 S.E.2d 453, 462 (1975).

Additionally, we note that the Legislature has amended W.Va.Code § 11–13–2a to provide a more specific definition of timber production. Effective March 31, 1982, production of timber ends when the tree is severed and its limbs removed. W.Va.Code § 11–13–2a (1982 Cum.Supp.). Although the amended statute does not control the disposition of this case, we find the Legislature's view compelling as we determine what constitutes timber production.

The parties have cited a number of cases which they believe support their positions. These cases may be classified into two categories. The first classification contains decisions which establish the general rule that the value of a natural resource must be determined at the place of production. *Soto v. Hope Natural Gas Co., supra; Hope Natural Gas Co. v. Hall,* 102 W.Va. 272, 135 S.E. 582 (1926), *aff'd,* 274 U.S. 284, 47 S.Ct. 639, 71 L.Ed. 1049 (1927). The second category contains cases which are individualized determinations in specific factual settings concerning when production of a particular natural resource ends for purposes of the business and occupation tax production levy. *Gilbert Imported Hardwoods, Inc. v. Dailey,* 167 W.Va. 587, 280 S.E.2d 260 (1981) (coal); *Bishop Coal Co. v. Dailey,* 166 W.Va. 548, 276 S.E.2d 220 (1981) (coal); *United Fuel Gas Co v. Battle,* 153 W.Va. 222, 167 S.E.2d 890 (1966) (natural gas).

In the present cases, we must determine when the production of timber occurs for it is at that point that the value must be calculated. *Soto v. Hope Natural Gas Co., supra.* We believe a reasonable application of W.Va.Code § 11–13–2a to the facts present results in a finding that for purposes of W.Va.Code § 11–13–2a [1974 Replacement Vol.], production of timber ends upon the severance, delimbing and topping of the tree. Our conclusion is supported by the expert testimony contained in the record, administrative actions by previous tax commissioners, and the Legislature's 1982 amendment of W.Va.Code § 11–13–2a.

Consequently, we find that the Commissioner erred in calculating the deficiency assessments in this case. The "place of use" alternative contained in Reg. BOT 1.2a is incorrect as a matter of law because timber production must be valued at the point of production. That location is in the field, not at the saw mill. Likewise, the assessments based on the "cost" method are in error because they included factors such as bucking and transportation to the saw mill. These costs are not to be included in determining the production value.

There remains a related issue to be considered. Because the Commissioner calculated production as continuing through delivery to the saw mill, he refused to give Georgia-Pacific industrial expansion credit for construction of an area at the saw mill designed to store logs prior to manufacture. Such credit was given for a similar area designed to store manufactured lumber. Since production ends in the field, Georgia-Pacific is logically entitled to the industrial expansion credit provided by W.Va.Code §§ 11–13C–2, –3.

For the reasons given above, we affirm the judgment of the Circuit Court of Kanawha County.

Affirmed.